**Avi NAKASH, et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, Defendant.**

**No. 88 Civ. 1481 (CHT).**

United States District Court,
S.D. New York.

Nov. 30, 1988.

Jones, Day, Reavis & Pogue, New York City (Robert Layton, Robert Deberardine, of counsel), for plaintiffs.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City (Helen M. Toor, Asst. U.S. Atty., of counsel), for defendant.

## OPINION

TENNEY, District Judge.

Plaintiffs, Avi, Ralph and Joe Nakash bring this action under the Privacy Act of 1974, 5 U.S.C. § 552a(g)(1) (1983), claiming that defendant, the United States Department of Justice, wrongfully disclosed information about them to third parties. The Justice Department is represented by the United States Attorney (the "Government"), which also had a role in the development of the facts underlying this case. The Government has moved to dismiss the complaint on the ground that the Justice Department is exempt from the application of relevant provisions of the Act. In the alternative, it has moved to stay the proceedings pending the conclusion of related criminal proceedings. Plaintiffs have cross-moved for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure, claiming that the Government's motions were meritless. For the reasons stated below, all three of these motions are denied. · In addition, the court *sua sponte* finds that counsel for plaintiffs have violated Rule 11 by moving for sanctions against the Government.

## BACKGROUND

Plaintiffs are the principal owners of Jordache Enterprises, Inc., the importer and manufacturer of a line of clothing made popular by an advertising campaign touting "the Jordache look" as the type that consumers "would like to know better." The Government, at least, was intrigued and obtained a search warrant authorizing the seizure of records from Jordache's offices in New York and New Jersey. During the execution of that warrant in January of 1986, Government agents impounded approximately 450 boxes of documents, 1350 reels of computer tapes and other information. The seized materials remain in the custody of the Government in the Southern District of New York.

At the time of the seizure plaintiffs were already embroiled in a civil lawsuit in California state court brought by their competitors, Georges, Maurice, Armand and Paul Marciano (the "California action"). *See* Affidavit of Robert Layton, sworn to July [date omitted] 1988 ("Layton Aff.") Exh. B. at 2.[1] The substance of that dispute is not in the record before this court, but plaintiffs claim that some of the seized records contained privileged material addressing "highly sensitive matters" such as internal discussions of settlement terms and strategies for discovery in the California action. Complaint ¶ 31. They also allege that the documents contained confidential business communications, trade secrets and other "highly sensitive information." *Id.*

During the course of the California action, the Marciano's sought discovery from the Nakashes of several categories of documents that encompassed items seized pursuant to the search warrant. Those efforts culminated in the Marciano's issuance of a subpoena to the Custodian of Records for the United States Attorney for the Southern District of New York. For reasons not relevant to the resolution of these motions, the Nakashes moved to quash that subpoena. Judge John F. Keenan denied their

---

**1.** The action, entitled *George Marciano, et al. v. Joe Nakash, et al.,* Case No. C524 347, is currently pending in the Superior Court of the State of California for the County of Los Angeles. Complaint ¶ 15.

motion and ordered the Government to produce the documents, concluding as follows:

> To the extent that the seized documents are discoverable under the California court's order, copies should be produced pursuant to the subpoena duces tecum. Any argument that the documents are not responsive to the California court's order should be addressed to that forum.

*John Doe, Inc., Subsidiaries and Affiliated Companies v. United States,* Cr. Misc. No. 1 p. 10 (LLS), slip op. at 7 (S.D. N.Y. July 27, 1987) (sealed order denying motion to quash) (emphasis added).[2] Plaintiffs allege that the California court's order referred to in Judge Keenan's order expressly exempted from discovery all documents subject to any type of privilege. Complaint ¶ 16. They also allege that they notified the Government by letter dated August 4, 1987, that the seized materials contained numerous documents not covered by Judge Keenan's order. *Id.* ¶ 21. The Government evidently never responded to this letter. *Id.* ¶ 22.

On October 9, 1987, under the Government's supervision, civil attorneys for the Marcianos reviewed the seized materials. The attorneys designated for photocopying and subsequently received 26,000 pages of documents, including some of the highly sensitive and privileged documents described above. These events occurred without plaintiffs' knowledge, although nothing in Judge Keenan's order required the Government to provide notice that it was complying with the subpoena. In fact, plaintiffs did not learn that any of the seized documents had been turned over to the Marcianos until the latter used them during a deposition in the California action.

Plaintiffs will presumably receive adequate protection against the use of privileged or improperly obtained evidence from the California courts.[3] They have brought this independent action under the Privacy Act seeking compensation for the costs of investigating and obtaining redress for the disclosure and for other damages resulting from the release of sensitive information to their litigation adversaries and business competitors.

## DISCUSSION

### I. *Motion to Dismiss*

#### A. The Privacy Act

##### 1. *Substantive Rights*

The Privacy Act, 5 U.S.C. § 552a (1983) (the "Act"), governs the collection and dissemination of information about individuals by the federal government. It serves three functions relevant to this lawsuit. First, it provides certain rights of access to such information, *id.* § 552a(d)(1), grants individuals about whom such information pertains the right to request amendment of erroneous material, *id.* § 552a(d)(2), and provides procedures under which denials of such requests to amend may be challenged, *id.* § 552a(d)(3)–(5).

Second, the Act restricts the ability of the government to disclose such information to third parties. Subsection (b) of the Act states, in pertinent part:

> No agency shall disclose any record which is contained in a system of records by any means of communication to any person, ... except pursuant to a written request by, or with the prior written consent of, the individual to whom the

---

**2.** Because of the pendency of a related grand jury investigation, a significant portion of the briefs, affidavits and other documents in this case are presently under seal. Nevertheless, the bulk of these materials consist of public information and matters that do not require sealing. Furthermore, none of the properly sealed information is determinative of the issues before the court. Therefore, rather than seal this opinion unnecessarily, the court has included in it only those materials it has deemed appropriate for disclosure. Its limited references to such documents should not be interpreted as a modification of the relevant sealing orders.

**3.** Plaintiffs have stated that the California courts have determined that the documents were, "in part, attorney-client privileged" and were, *"in toto,* improperly obtained from the Government." Plaintiff's Memorandum in Opposition to Motion to Dismiss or Stay ("Pl. Mem.") at 4 n. 2.

record pertains, unless disclosure of the record would be—

&ast; &ast; &ast; &ast; &ast; &ast;

(11) pursuant to the order of a court of competent jurisdiction....

5 U.S.C. § 552a(b). Plaintiffs never authorized the disclosure of the documents in this case. *See* Complaint ¶ 43. Furthermore, they allege that the disclosure was not authorized by the orders of the California courts or Judge Keenan. Therefore, plaintiffs allegations establish a violation of subsection (b), the anti-disclosure provision.

Third, the Act provides civil remedies for violations not only of the access provisions but the anti-disclosure provisions as well. Subsection (g) of the Act states, in relevant part:

**Civil remedies**

Whenever any agency

(A) makes a determination under [this Act] not to amend an individual's record in accordance with his request, or fails to make such review in conformity with [the Act];

(B) refuses to comply with an individual request [to review his or her records];

(C) fails to maintain any record concerning any individual with [the requisite] accuracy, relevance, timeliness, and completeness ...; or

(D) *fails to comply with any other provision* of this [Act], or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,

the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

---

**4.** The Act also provides criminal penalties for certain disclosures, 5 U.S.C. § 552a(i)(1), and failures to maintain files without revealing their existence, *id.* § 552a(i)(2), as well as for obtaining access to records under false pretenses, *id.* § 552a(i)(3).

**5.** There are at least suggestions in the legislative history of the Act that this assumption may not be correct:

5 U.S.C. § 552a(g)(1) (emphasis added).[4] Thus, these provisions in the Act provide plaintiffs with the right to bring this lawsuit to seek damages for the release of the seized documents.

2. *Exemptions Under the Act*

The analysis does not end here, however, because the Act also permits eligible agencies, such as the Justice Department, to exempt themselves from some of its requirements. Agencies may avail themselves of this right under two provisions: a list of specific exemptions, none of which apply to this case, 5 U.S.C. § 552a(k), or a general exemption section, which is the subject of this motion to dismiss, *id.* § 552a(j). The issue is whether the general exemption provision is as broad as the Government asserts. Assuming that it is, a secondary question is whether the Justice Department has fully availed itself of its protection. For the reasons discussed below, the court finds that the answer to both of these questions is no.

The Act pertains only to "systems of records" and the exemption provision applies only to systems of records such as "reports" that have been compiled by the government itself. The information in this case consists of documents generated by plaintiffs, which were merely in the custody of the Justice Department. Under these circumstances, the court has some doubt that the Privacy Act was intended to encompass these types of records. Nevertheless, for the purposes of this motion, both sides have conceded that the seized records fall within the language of both the Act and the Justice Department regulations. *See* Defendant's Memorandum in Support of Motion to Dismiss or Stay ("Def. Mem.") at 5 & n. 3; Complaint ¶ 41. Accordingly, the court has assumed in this opinion, without deciding, that this is the case.[5]

---

MR. ERLENBORN. Mr. Chairman, as I understand it, the purpose of the amendment [5 U.S.C. § 552a(d)(5)] is to protect, as an example, the file of the U.S. Attorney or the solicitor that is prepared in anticipation of the defense of a suit against the United States for accident or some such thing?

MR. BUTLER. That is the subject we have in mind.

■ The general exemption provision provides that the head of any eligible agency may promulgate rules

> to exempt any *system of records* within the agency from *any part* of this [Act] except subsections (b), (c)(1) and (2), (e)(4)(A) through (F), (e)(6), (7), (9), (10), and (11), and (i) if the system of records is [maintained by an agency whose principal function is law enforcement and has been] compiled for the purposes of a criminal investigation, including reports of informants and investigators. . . .

*Id.* (emphasis added). The Government notes that subsection (g), the civil remedies provision, is not among those excluded from the application of the general exemption provision. It argues that the language of the general exemption provision is broad enough to permit the Justice Department to exempt itself from the application of any provision in the Act that has not been expressly excluded. Under its interpretation, even though the Justice Department could not exempt itself from the requirements of the anti-disclosure provision, it could exempt itself from any civil liability for violating it, or for that matter, any other provision of the Act—in essence, immunizing itself from all possible civil liability under the Act.

Certainly subsection (g) is "conspicuously absent" from the list of exclusions in the general exemption provision. *See Tijerina v. Walters,* 821 F.2d 789, 795 (D.C.Cir. 1987). The crucial question is why. The Government insists that the language and, therefore, the intent of Congress is "clear and unequivocal," concluding that it deliberately and purposely chose to omit subsection (g). *See* Defendant's Reply Memorandum in Support of Motion to Dismiss or Stay ("Def. Reply Mem.") at 6–7. Plaintiffs respond that subsection (g) has no relevance to the exemption provision and

find no significance in its absence. *See* Pl. Mem. at 11.

### 3. *Legislative History*

The Government's interpretation is grounded only in linguistics. While language analysis is an important element of statutory interpretation, it is not the only one; the construction of an act must be consistent with its underlying purpose and legislative history. The Government's interpretation conflicts with the basic purpose of the Privacy Act and has absolutely no support in its legislative history. Therefore, the court rejects it.

The Privacy Act was a product of the post-Watergate reform era and represented an effort by the Congress to begin to control the collection and dissemination of information about individuals by the federal government. The perceived disregard of fundamental privacy rights by federal officials was noted as one of the reasons for introducing this legislation. As Representative Moorhead, who presented the House bill, remarked:

> It seems to me that the events of the past several years have a lesson in them. Americans want to see more credibility in Government, and they want to see the removal of any undue Government power which could be used to invade their personal privacy.

120 Cong.Rec. 36,644 (1974). The Privacy Act was intended to control such abuse by making the federal government accountable for its actions. Representative Moorhead continued to explain the purpose of the Act as follows:

> This landmark legislation, H.R. 16373, is a first step in that direction. It is in total harmony with the spirit of the Constitution. It gives *individuals* as a matter of right some meaningful control

---

MR. ERLENBORN. I appreciate the gentleman's concern. I think it is a real concern, and that protection ought to be afforded.

The only problem I find with that amendment is this: It would presuppose we intended the defining of "record system" to preclude [sic] that type of record. I do not think we did.

\* \* \* \* \* \*

Frankly, I do not think the attorney's files that are collected in anticipation of a lawsuit should be subject to the application of the act in any instance, much less the access provision. It is our concern in the access provision that it may then presuppose it is covered in the other provisions, and I do not think it should be.

120 Cong.Rec. 36, 960 (1974).

over how the Federal Government utilizes personal information about them. *Id.* (emphasis added).

With the introduction of this legislation, Congress began the process of opening up the government's files. The unprecedented civil remedies provision would eventually give individuals a powerful tool to use in gaining access to government files; therefore, it was very clear that the Act had to provide the government a method to avoid exposing legitimately secret information and the legislative history establishes that the general exemption provision was included to address this concern.

Delving into the legislative history does not eliminate the considerable difficulty of trying to establish a negative. There is no discussion in which Congress explicitly states that an agency cannot do what the Government claims the Justice Department has done. Conversely, however, there is absolutely no indication in the extensive debates and reports of either the House or Senate that Congress even considered such a disturbing possibility. That is a compelling reason not to construe the Act in a manner that permits it to occur.

The link between the access and general exemption provisions is evident in statements made during the House debates.[6] At one point, Representative Abzug, one of the bill's sponsors, sought to eliminate the *per se* application of the general exemption section to the records of the Central Intelligence Agency, *see* 5 U.S.C. § 552a(j)(1); 120 Cong.Rec. 36,960 (1974). She did not believe that the mere fact that records were maintained by the CIA merited an automatic exemption from most of the provisions of the Act. Although she ultimately failed in this effort, she argued that "exemptions should relate to the type of data sought to be protected from disclosure, not to the agency maintaining such records," 120 Cong.Rec. 36,960, an accurate characterization of the operation of the Act.

The opposition to her proposed amendment concentrated exclusively on the repercussions that open access would have on the operations of the CIA.[7] In rebuttal, Representative Abzug again stressed that "[a] blanket exemption for any agency even or especially this one agency has no place in this bill." 120 Cong.Rec. 36,961. Representative Moorhead, who sponsored the bill, was the last member to speak in opposition to the amendment. He responded to Representative Abzug's comments as follows:

Let me explain to the Members that the CIA is not entirely exempt under this bill. The agencies listed under general exemptions are affirmatively subject to the major disclosure and the requirement section of the act. The CIA must follow the conditions of disclosure, or I should say nondisclosure, as enumerated in subsection (b) of the bill. This is a *major* provision of the bill with which the Agency *must* be in compliance—with what the Agency may or may not do with their records.

*Id.* (emphasis added). Almost immediately thereafter, the proposed amendment was rejected. *Id.*

The character and timing of Representative Moorhead's remarks suggest not only

---

**6.** The House deliberations are particularly important in questions involving the Privacy Act. The sponsors and floor managers of the initial bills in both houses felt it imperative for some privacy legislation to be enacted before the congressional session came to an end. Since the session was drawing to a close, however, they realized that they would not be able to resolve the complex differences between the House and Senate versions so the Senate agreed to adopt the House bill. *See* 120 Cong.Rec. 40,880 (1974) (remarks of Rep. Moorhead). Accordingly, the resulting legislation, even with some Senate amendments, "retain[s] the basic thrust of the House version...." *Id.*

**7.** For example, one representative argued that "[t]he fact is, we ought not limit the United States to carrying on the activities of the Central Intelligence Agency in such a way that its files are kept under cellophane." 120 Cong.Rec. 36,-961 (remarks of Rep. Erlenborn). Another stated that "I just do not believe that anyone has the right or should have the right to go in and expose the most sensitive area in the protection of our national security." *Id.* (remarks of Rep. Holifield).

that the House was most concerned with access but, contrary to the Government's assertions, *see* Def. Reply Mem. at 8 n. 4, that it considered enforcement of the disclosure provisions to be an important aspect of the Act. While these types of contemporaneous comments are not controlling, *see Berger v. Heckler,* 771 F.2d 1556, 1574 (2d Cir.1985), they are consistent with the House report, which stated:

> Only records maintained by the Central Intelligence Agency and criminal justice records could be so exempted. *Even they would be subject to the requirements relating to conditions of disclosure ....* The Committee believes that such a broad [exemption] is permissible for these two types of records because they contain particularly sensitive information. C.I.A. files may include the most delicate information regarding national security.... The Committee also wishes to stress that this section is not intended to require the C.I.A. and criminal justice agencies to withhold all their [personnel] records from the individuals to whom they pertain. We urge those agencies to keep open whatever files are presently open and to make available in the future whatever files can be made available without clearly infringing on the ability of the agencies to fulfill their missions.

H.R.Rep. No. 93–1416, 93d Cong., 2d Sess. 18, *quoted in Tijerina v. Walters,* 821 F.2d 789, 796 (D.C.Cir.1987) (emphasis added). As the Senate report reveals, the civil remedies provision was intended to be the Act's primary enforcement mechanism:

> [T]his bill not only establishes certain administrative requirements and grants certain rights to citizens, but gives authority to the citizen to defend his rights by taking the initiative of court action. *Such a right is doubly important* since the revised bill gives no enforcement authority to the [proposed Privacy] Commission.

S.Rep. No. 1183, 93d Cong., 2d Sess. 82, *reprinted in* 1974 U.S.Code Cong. & Admin.News 6916, 6996 (emphasis added). In light of the importance Congress attached to the anti-disclosure and the civil remedy provisions, it would indeed be anomalous to conclude that it also intended, without any comment or explanation, to weaken them by permitting eligible agencies to exempt themselves from the Act's civil enforcement procedures.

### 4. *Prior Decisions*

The Government's interpretation was rejected by the Court of Appeals for the District of Columbia in *Tijerina v. Walters,* 821 F.2d 789, 797 (D.C.Cir.1987). In that case, the court noted that if it adopted the Government's position, eligible agencies would acquire a "license to defang completely the strict limitations on disclosure that Congress intended to impose." *Id.* at 797. Instead, it concluded that the general exemption provision had no applicability to subsection (g). It stated:

> Subsection (j) only permits an agency to exempt a *system of records* from the requirements set out in other provisions of the Act. Subsection (g), the Act's civil remedies provision, does not regulate systems of records. It is a derivative provision directed not towards agencies but towards courts and aggrieved individuals: the subsection provides a grant of jurisdiction and a waiver of sovereign immunity for suits alleging certain violations under the Act. It simply makes no sense for an agency to use subsection (j) to exempt a system of records from civil liability: records are not subject to civil liability under the Act; the United States is.

*Id.* at 795–96 (emphasis in original).

The *Tijerina* court's rationale is largely supported by an examination of the sections that Congress believed would have remained subject to the exemption provision had they not been expressly excluded.[8]

---

**8.** The provisions excluded in the general exemption provision serve the following functions: Subsection (b) prohibits disclosure of information except under specified conditions; Subsections (c)(1) and (2) govern the maintenance of records of each such disclosure; Subsections (e)(4)(A) through (F) require publication in the Federal Register of the exist-

Contrary to the *Tijerina* court's observation, however, not all of them are logically applicable only to "systems of records," but each imposes duties or restrictions concerning such records that must be followed by the agencies and their employees. In contrast, aside from establishing jurisdiction in federal courts and setting other procedures for litigation, subsection (g) simply provides a cause of action to aggrieved individuals. It does not impose any substantive duties or restrictions on agencies or their employees. Therefore, it is not within the class of provisions intended to have been subject to the general exemption provision. Since it could never have fallen within its terms in the first place, there would have been no reason for Congress to have excluded it from the application of the general exemption provision.

In addition, Congress could not have anticipated that agencies would consider exempting themselves from the civil remedies provision absent a concurrent and permissible exemption from one of the Act's substantive provisions. Once an agency has chosen to exempt records from a substantive provision, there is no logical reason to seek an independent exemption from civil liability: since the agency cannot commit a substantive violation *a fortiori* it cannot be subject to any possible civil liability. These points support the *Tijerina* court's overall conclusion that subsection (g) was not within the class of provisions subject to the application of the general exemption provision.

None of the cases cited by the Government provide adequate support for its interpretation of the Act. In *Kimberlin v. United States Department of Justice*, 788 F.2d 434, 436 n. 2 (7th Cir.), *cert. denied*, 478 U.S. 1009, 106 S.Ct. 3306, 92 L.Ed.2d 719 (1986), *Alexander v. United States*,

787 F.2d 1349, 1351–52 (9th Cir.1986), and *Wentz v. The Department of Justice*, 772 F.2d 335, 338 (7th Cir.1985), *cert. denied*, 475 U.S. 1086, 106 S.Ct. 1470, 89 L.Ed.2d 726 (1986), the courts merely held that—contrary to the circumstances in this case—the information involved was exempt from substantive provisions of the Privacy Act. The language upon which the Government relies in *Ryan v. Department of Justice*, 595 F.2d 954 (4th Cir.1979), is no more than dictum concerning an issue about which the court provided no analysis. *See id.*, 595 F.2d at 958 (stating that "while the Justice Department had the authority to *completely* exempt JUSTICE/CRT–001 from the application of all of the civil remedies," it had not done so in that case) (emphasis in original). Therefore, *Tijerina* is the only reported case in which the question before this court has been addressed. Although not binding upon this court, its reasoning is persuasive and thoroughly supported by the legislative history and purpose underlying the Act.

5. *The Apparent Anomaly in the Use of Subsection (i)*

The Government argues that none of this reasoning or precedent can explain the presence of subsection (i), the criminal liability provision, in the list of exclusions in the general exemption provision. It asserts that by excluding criminal penalties but not civil remedies Congress "clearly distinguished" between the two, intending to permit eligible agencies to exempt themselves from civil but not criminal remedies. Def. Reply Mem. at 9. Although this argument merits some discussion, it does not have the significance claimed by the Government.

Subsection (i) was not discussed in the *Tijerina* decision and is difficult to reconcile with it. As the Government notes, in

ence and character of, and the access procedures for, systems of records maintained by agencies;
Subsection (e)(6) requires reasonable efforts to ensure accuracy and completeness of information prior to any permitted disclosure;
Subsection (e)(7) prohibits the maintenance of any records concerning the exercise of First Amendment rights;

Subsection (e)(9) requires the establishment of rules of conduct for personnel involved in the maintenance of any system of records;
Subsection (e)(10) requires the implementation of safeguards to protect the integrity of any such systems;
Subsection (i) imposes criminal penalties for certain violations. *See supra* note 4.
*See* 5 U.S.C. § 552a(j).

the context of the general exemption provision, criminal remedies are similar to civil remedies, in that neither are intuitively "systems of records." The presence of subsection (i), therefore, undermines the premise of the *Tijerina* court that systems of records cannot be subject to penalties of any kind and its conclusion that the civil remedies provision could not be subject to the terms of the general exclusion provision. If nothing else, Congress' decision to exclude subsection (i) from the general exemptions provision reveals an implicit assumption that it could have applied to *criminal* penalties.

Even under this court's determination of the scope of the general exemption provision, the presence of subsection (i) presents analytical difficulties. Like the civil remedies provision, it does not impose any substantive duties or requirements on an agency or its employees. It simply specifies the possible consequences of certain conduct and provides a legal remedy, in this case, a criminal action by the government. Despite these apparent inconsistencies, the presence of subsection (i) does not compel a different result than that reached in *Tijerina.*

The rationale for including subsection (i) in the list of exclusions in the general exemption provision was not nearly as well-considered as the Government has suggested. It was added to the growing list of exclusions [9] for no other reason than to close a perceived but nonexistent loophole. The entire and brief discussion concerning the addition of subsection (i) was as follows:

---

**9.** As the following excerpts reveal, the list of exclusions in the general exemptions provision expanded as the House bill moved through the legislative process.

> Except for subsections (c)(1) and (c)(3), the provisions of this section shall not apply to any record or system of records which is....

H.R. 16373, 93d Cong., 2d Sess. § (i) at 14 (1974) (superseded text).

> The head of any agency may promulgate rules, in accordance with the requirements (including general notice) of section 553 of this title, to exempt any system of records within the agency from any part of this section except subsections (b) and (e)(2)(A) through (F) if the system of records is....

Mr. MOORHEAD of Pennsylvania. Mr. Chairman, I offer a technical amendment.

The Clerk read as follows:

> Amendment offered by MR. MOORHEAD of Pennsylvania: On page 33, line 2, after "(F)" insert "and (i)".
>
> On page 30, line 24, strike "(j) or".[10]

Mr. MOORHEAD of Pennsylvania. Mr. Chairman, I will be brief in explaining this amendment, which has been previously discussed with the minority side. Very simply, it tightens up a part of the bill where a loophole might exist. It provides that if the head of an agency utilizes the authority under subsection (j) of the bill to exempt a system of records from this law, such action shall not exempt the particular agency from safeguards to the public against abuse of such exemption authority as provided in subsection (i), imposing criminal penalties for violations of the act.

I trust that the amendment will be adopted.

Mr. ERLENBORN. Mr. Chairman, will the gentleman yield?

Mr. MOORHEAD of Pennsylvania. I yield to the gentleman from Illinois.

Mr. ERLENBORN. I thank the gentleman for yielding to me. I do support the amendment.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Pennsylvania (MR. MOORHEAD).

The amendment was agreed to.

120 Cong.Rec. 36,655 (1974).

The basis for Representative Moorhead's concerns and the efficacy of his proposed

---

*Id.* § (j) at 32–33 (superseding text).

> The head of any agency may promulgate rules, in accordance with the requirements (including general notice) of sections 553(b)(1), (2), and (3), (c), and (e) of this title, to exempt any system of records within the agency from any part of this section except subsections (b), (c)(1) and (2), (e)(4)(A) through (F), (e)(6), (7), (9), (10), and (11), and (i) if the system of records is....

5 U.S.C. § 552a(j) (1983).

**10.** This second change simply corrected a drafting error in an unrelated section of the bill.

solution are not particularly clear. It appears that he was troubled by the possibility that agency heads might exempt their records for improper purposes and wanted to be sure that criminal provisions were available to deter such conduct. His efforts might have been in vain since the criminal provisions in the Act do not cover any type of "abuse of exemption authority." *See* 5 U.S.C. § 552a(i). Nevertheless, no matter what he perceived the loophole to be, he offered the amendment only as a "technical" matter to close it, not for any other purpose.

In light of the proffered rationale for the change, it would be no more than rank speculation to suppose that it was also intended to negate the otherwise clear and reasonable legislative intent in favor of individual enforcement. The court finds it significant that much of the drafting of the Act occurred in the haste of the closing days of the congressional session. *See* 120 Cong.Rec. 40,411–12 (remarks of Sen. Hruska); *id.* at 40,880 (remarks of Rep. Moorhead). As one member admitted, for example, "[m]any of the changes pertaining to law enforcement may have been inadvertently included with [sic] a full realization of their total effect." *Id.* at 40,411 (remarks of Sen. Hruska). As one of the Act's sponsors admitted, the legislation in its final form was "far from perfect." *Id.* at 40,886 (remarks of Rep. Koch). In this context, relatively little weight can be given to the last-minute and largely inexplicable addition of subsection (i) to the list of exclusions in the general exemption provision.

Therefore, while the Government's inference regarding the presence of subsection (i) deserves consideration, it is, in the end, no more than an abstract concept in conflict with and outweighed by the legislative history of the Act. As the Supreme Court has stated, "the canon in favor of strict construction is not an inexorable command to override common sense and evident statutory purpose. It does not require magnified emphasis upon a single ambiguous word in order to give it a meaning contradictory to the fair import of the whole remaining language." *United States v.*

*Brown,* 333 U.S. 18, 25–26, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1948). The Court of Appeals for the District of Columbia has similarly explained that "in interpreting legislation courts are not straitjacketed by Congress' choice of words. When the language used so conflicts with evidenced congressional intent that a mistake in draftsmanship is obvious, courts may remedy the mistake." *Symons v. Chrysler Corporation Loan Guarantee Board,* 670 F.2d 238, 242 (D.C.Cir.1981); *accord United States v. Babcock,* 530 F.2d 1051, 1053 (D.C.Cir.1976). Although the court is not reading subsection (i) out of the list of exclusions, it concludes that it has no relevance to the questions concerning the application of the civil remedies provision.

**B. The Justice Department Regulations**

■ Even if the Privacy Act permitted the result claimed by the Government, plaintiffs would still have a cause of action because the Government's assertion that the Justice Department has fully exempted itself from all civil liability is belied by the context and language of the relevant regulations.

Under the Act, agencies claiming exemptions under the general exemption provision must publish the justification for doing so. *See* 5 U.S.C. § 552a(j). The pertinent Department of Justice regulation states:

**§ 16.81 Exemption of United States Attorneys Systems—limited access.**

(a) The following systems of records are exempt from 5 U.S.C. 552a(c)(3) and (4), (d), (e)(1), (2) and (3), (e)(4)(G) and (H), (e)(5) and (8), (f), *and (g)*:

\*　\*　\*　\*　\*　\*

(2) Civil Case Files (JUSTICE/USA–005).

\*　\*　\*　\*　\*　\*

(4) Criminal Case Files (JUSTICE/USA–007).

\*　\*　\*　\*　\*　\*

(6) Major Crimes Division Investigative Files (JUSTICE/USA–010).

\*　\*　\*　\*　\*　\*

(b) Exemptions from the particular subsections are justified for the following reasons:

\*     \*     \*     \*     \*     \*

(3) From subsection (d) because access to the records contained in these systems would inform the subject of a criminal or civil investigation, matter or case of the existence of such, and provide the subject with information that might enable him to avoid detection, apprehension or legal obligations, and present a serious impediment to law enforcement and other civil remedies. Amendment of the records would interfere with ongoing criminal law enforcement proceedings and impose an impossible administrative burden by requiring criminal investigations to be continuously reinvestigated.

\*     \*     \*     \*     \*     \*

(10) From subsection (f) because this system has been exempted from the individual access provisions of subsection (d).

(11) From subsection (g) because these systems of records are compiled for law enforcement purposes *and have been exempted from the access provisions of subsections (d) and (f).*

28 C.F.R. § 16.81 (1987) (emphasis added). The justification for the purported exemption thus supports it only to the extent that it exempts records from the Act's *access* requirements.

As previously discussed, once an agency exempts a system of records from a substantive provision, there can be no violation of it and, accordingly, no possible civil liability. Therefore, it was not necessary for the Justice Department even to have exempted itself from subsection (g) for any purposes. Nevertheless, the Act did not expressly "prohibit" such exemption, so the Justice Department apparently took advantage of every perceived opportunity under it to protect itself from liability and eliminated all possible sources, real or imagined. Nevertheless, it is equally apparent that the exemption of subsection (g) was intended to be only as broad as was necessary to preclude the possibility of civil liability aris-

ing under the stated access positions. *See Ryan v. Department of Justice,* 595 F.2d 954, 958 (4th Cir.1979); *see also Tijerina,* 821 F.2d at 796 (stating that "[n]one of the purposes the VA cited is remotely served by allowing the agency to escape civil liability for violations of the disclosure or accuracy requirements of the Act").

In urging that the regulation was intended to exempt the Justice Department from liability for wrongful disclosures, the Government asserts that the justification may be read disjunctively, so that it expresses two distinct rationales. *See* Def. Reply Mem. at 11. It further claims that the initial clause—that the relevant records "are compiled for law enforcement purposes"—can stand alone as a justification for the broader interpretation of the claimed exemption. The court need not decide what, if any, authority it has to determine whether this would provide a legally sufficient basis for the claimed exemption, since the Government's interpretation is inconsistent with the fact that it falls under the regulation's general heading: "limited access." It is far more likely, and the court finds, that the Justice Department intended to exempt itself from subsection (g) only to the extent that it had already exempted itself from the stated access provisions. Therefore, even if it had assumed that it had the power to do so, the Justice Department did not enact regulations that would immunize it from this lawsuit.

## II. *Motion to Stay*

◾ The Government's motion to stay is based on concerns about the possible effects of discovery on the integrity of the related grand jury investigation. Some of these concerns would appear to be justifiable if plaintiffs insisted on pursuing the fairly wide net that they have indicated they intend to cast in discovery, *see* Def. Mem. at 14. Plaintiffs have also indicated that they are willing to narrow discovery to address those concerns, *see* Pl. Mem. at 20–21, however, and the court believes that an appropriately limited process will not

interfere with the related criminal proceedings.

Courts are often requested to limit civil proceedings arising out of the same or related transactions as those involved in a pending criminal proceeding. *See, e.g., United States v. One 1964 Cadillac Coupe DeVille,* 41 F.R.D. 352, 353 (S.D.N.Y.1966); *see also Founding Church of Scientology v. Kelley,* 77 F.R.D. 378, 380 n. 4 (D.D.C. 1977) (limiting civil discovery during grand jury investigation). When the Government requests such a stay, it is usually because of concerns that (1) the broad disclosure of the essentials of the prosecution's case may lead to perjury and manufactured evidence; (2) the revelation of the identity of prospective witnesses may create the opportunity for intimidation; and (3) the criminal defendants may unfairly surprise the prosecution at trial with information developed through discovery, while the self-incrimination privilege would effectively block any attempts by the Government to discover relevant evidence from the defendants. *See Founding Church of Scientology,* 77 F.R.D. at 381. The determination of how best to address these considerations is within the discretion of the court and should be made in light of the particular circumstances of each case. *Securities & Exchange Comm'n v. Dresser Industries,* 628 F.2d 1368, 1375 (D.C.Cir.) (en banc), *cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980). Nevertheless, the Government is not entitled to any particular type of relief; the court may elect to stay the civil proceedings in their entirety, postpone discovery or impose appropriate protective orders and conditions. *Id.*

In this case, the possible areas of investigation may be divided into two categories: those events occurring before the Marcianos propounded their discovery requests and those occurring thereafter. Based upon a review of the *in camera* submissions, the court has determined that the grand jury's investigation has no relation to the events in the latter category, so that plaintiffs could discover, for example, the process by which the Government interpreted the discovery documents and orders and the circumstances surrounding the actual inspection and disclosure of the seized documents. Therefore, it may proceed in these limited areas without posing any threat to the grand jury investigation.[11] *See Texaco, Inc. v. Borda,* 383 F.2d 607, 608–10 (3d Cir.1967) (staying discovery except for deposition of one individual).

The court recognizes that some witnesses with knowledge of properly discoverable facts may also have knowledge of facts pertaining to the criminal investigation that should not be revealed. Moreover, there may be instances in which the mere act of asserting the right not to answer certain questions may be revealing in and of itself. Nevertheless, based on the information presently before the court it appears that such concerns may be addressed with appropriate limiting orders.[12] In any event, almost all of the relevant facts are undisputed, which should obviate the need for very extensive discovery.

### III. *Request for Sanctions*

■ In a tactic becoming all too familiar, plaintiffs have attempted to bolster their meritorious response to the Government's motions with an utterly frivolous and unwarranted request for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. That request is summarily denied. In addition, the court finds that by bringing a Rule 11 motion plaintiffs have contravened the very standards that they have accused the Government of violating.

---

**11.** The Government has raised its specific concerns and other legal arguments in its *in camera* submissions, which cannot be addressed in this opinion. These are discussed separately in a sealed addendum to this opinion, a copy of which has been provided to the Government.

**12.** For example, most of the areas of concern are completely irrelevant to the issues underlying this lawsuit and may, accordingly, be excluded from discovery. In addition, once the permissible areas of investigation are determined, the government may be able to produce witnesses whose knowledge is limited only to these areas. If necessary, the court may allow plaintiffs to explore certain areas only through interrogatories, which will provide the government a significant degree of control in framing responses.

Accordingly, on its own motion, the court finds plaintiffs to be in violation of Rule 11 and imposes sanctions.

Aside from the fact that their motion has no legally cognizable basis in law or fact, plaintiffs have completely disregarded the court's participation in the Government's decision to file its motions. During a conference before Judge John M. Walker of this court, the Government sought and was granted permission to move to dismiss the complaint on the grounds addressed in this opinion. *See* Declaration of Helen M. Toor, executed July 29, 1988, ¶¶ 3–4 ("Toor Declaration"). Plaintiffs concede that Judge Walker "did state that the motion to dismiss raised issue as to the legal validity of the complaint and would have to be decided." Layton Aff. ¶ 8. Plaintiffs dispute the Government's claim that Judge Walker also authorized the motion to stay, *see* Toor Declaration ¶¶ 3–4, but they do not contend that the Government was in any manner denied permission to file such a motion. *See* Layton Aff. ¶ 7. During the conference, Judge Walker apparently suggested that discovery might be able to proceed under conditions such as those articulated in this opinion, *see* Layton Aff. ¶ 8, but he also apparently considered the issues raised by the anticipated motions significant enough to merit a stay of discovery pending their resolution. Toor Decl. ¶ 5.

Relations between plaintiffs and the Government have been somewhat contentious. *See, e.g.,* Letter from Robert Layton, Esq. to Helen M. Toor, Esq., dated June 7, 1988 (Layton Aff. Exh. B) ("Layton letter"); Letter from Helen M. Toor, Esq. to Robert Layton, Esq., dated June 14, 1988 (Layton Aff. Exh. C) ("Toor letter"). For example, each side accuses the other of misrepresenting prior conversations. *See* Toor Letter at 1–2; Toor Decl. ¶¶ 2, 8; Layton Aff. ¶ 7. This may have been a contributing but improper factor in plaintiffs' decision to seek sanctions. Furthermore, plaintiffs had been trying without success to move discovery along and were clearly frustrated by the possibility of a new reason for delay. *See* Layton Aff. ¶¶ 2–6. This might have led them to hope that including a Rule 11 motion would con-vince the court of the strength of their arguments and prompt a summary denial of the Government's motions.

In an effort to dissuade the Government from filing the motions, plaintiffs drafted a brief letter citing two cases supporting its own belief that the exemption argument was "meritless." *See* Layton letter at 3. Plaintiffs now claim that they also raised the issue of Rule 11 sanctions at some point before the Government filed its motions. *See* Layton Aff. ¶ 9. There is no indication in any of the correspondence that this occurred, however, and the Government claims that the issue did not actually surface until several days before plaintiffs' responses to the Government's motions were due. *See* Toor Decl. ¶ 8.

The Government eventually filed its motions accompanied by a seventeen-page brief and several declarations, one of which was submitted for *in camera* review only. In their opposing brief, plaintiffs requested Rule 11 sanctions, arguing that the Government's motion to dismiss was "repudiated by the language of the statute, the legislative history of the Privacy Act, and by all the cases cited by its own counsel." Pl. Mem. at 24–25. They also argued that the motion to stay was "even more frivolous" since—as they characterized it—Judge Walker had "frowned" during the conference on the Government's interest in a stay. *Id.* at 25. Plaintiffs also argued that "by its failure to do more than argue for the stay in abstract terms and with bare allegations, defendant implicitly concede[d] that it has no factual basis to support its claim that discovery in this civil action will interfere in some way with the Government's criminal investigation." *Id.*

Plaintiffs' request for sanctions under Rule 11 was completely unwarranted under either of the grounds asserted. Under Rule 11 an attorney's signature on a motion signifies

> that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the exten-

sion, modification, or reversal of existing law, and that it is not interposed for any improper purpose....

Fed.R.Civ.P. 11.

■■■ Requests for sanctions seek court orders and are, therefore, subject to the same Rule 11 analysis as all other motions. *See* Fed.R.Civ.P. 7(b), 11. The Court of Appeals of this Circuit has indicated that sanctions shall be imposed whenever "it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands...." *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985), *cert. denied,* — U.S. —, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). In determining whether requests for sanctions constitute independent violations of the Rule, courts must determine whether at the time the request was signed a competent attorney would have concluded that it "was destined to fail." *Id.,* 762 F.2d at 254; *see Oliveri v. Thompson,* 803 F.2d 1265, 1274 (2d Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). If this would have been the case, then pursuing it constitutes a violation of Rule 11, mandating the imposition of sanctions. *See Eastway,* 762 F.2d at 254 & n. 7.

■■■ An attorney who contemplates filing a Rule 11 motion must consider the very liberal standards that will govern the court's review of the validity of the substantive motion under attack. As the *Eastway* court stated, Rule 11 is "not intend[ed] to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law." 762 F.2d at 254. Accordingly, courts are generally very lenient in deciding whether the target motion was justifiable at the time it was signed. For example, the Sec-

ond Circuit has held that "[c]ourts must strive to avoid the wisdom of hindsight" and has mandated that "any and all doubts must be resolved in favor of the signer." *Id.* A leading treatise also cautions: "sanctions are inappropriate where there are differing interpretations of the law or where contrary controlling authority is not obvious. In determining whether a filing is frivolous, courts are to resolve ambiguities in favor of the filing party." 2A J. Moore, J. Lucas & G. Grotheer, Moore's Federal Practice ¶ 11.02[3] (2d ed. 1987) (footnotes omitted). Before filing a Rule 11 motion, an attorney must also examine the target document under these very forgiving standards.

■■■ In their zeal to underscore the strength of their responses to the Government's motions, plaintiffs failed to heed that directive. Although their logic was appealing, there was scant authority for plaintiffs' position. The language of the Act was, at best, ambiguous. Moreover, the issue raised in the Government's motion to dismiss had been addressed in only one other case, in another circuit, and there was dictum, at least, in the cases of other circuits that would have supported the Government's interpretation.[13] Finally, the Government's position was supported by an arguable interpretation of Justice Department regulations that could have been promulgated only if that agency had first determined that the Act permitted the kind of exemption claimed in this case. Therefore, it should have been clear to plaintiffs that there was an ample basis for the Government to file the motion to dismiss.

Similarly, the Government had sufficient grounds upon which to assert its motion to stay. Plaintiffs' allegations that the lack of detail revealed a lack of merit completely disregarded the constraints under which the Government was able to disclose its

---

**13.** The Government's strongest argument—that concerning subsection (i)—was not raised until after plaintiffs had filed their request for sanctions. Therefore, it would be unreasonable to presume that they were, or should have been, aware of it when they signed their request. In this circuit, attorneys have no continuing obligation under Rule 11 to update previously filed documents. *See Calloway v. Marvel Entertain-*

*ment Group,* 854 F.2d 1452, 1472 (2d Cir.1988); *Oliveri v. Thompson,* 803 F.2d 1265, 1274 (2d Cir.1986). *Contra Robinson v. Nat'l Cash Register Co.,* 808 F.2d 1119, 1127 (5th Cir.1987); *see Calloway,* 854 F.2d at 1470 n. 6 (noting contrary authority). Accordingly, the subsection (i) argument cannot be a factor in determining the validity of plaintiffs' request. *But see infra* note 14.

factual support. At the time that the Government filed its motions, plaintiffs were well aware of its concerns about the possible impact of this case on the related grand jury proceedings. *See* Layton Aff. ¶¶ 7–8. Plaintiffs knew that the Government had submitted supporting evidence for *in camera* review only, *see* Letter from Helen M. Toor, Esq. to Hon. John M. Walker, Jr., dated June 24, 1988 (with copy to Robert Layton, Esq.); Notice of Motion to Dismiss or Stay, dated June 23, 1988, yet they acted as if these submissions were not even a part of the record. This lack of candor was unjustifiable.

To have succeeded on their motion, plaintiffs needed to establish that the Government's motions were so weak that reasonable attorneys could not have disagreed on their eventual outcome. Their own actions suggest that they did not possess that confidence. One might have expected that a motion that was so meritless as to deserve sanctions would warrant only a one- or two-page memorandum recommending dismissal. Yet plaintiffs felt compelled to file a twenty-seven-page brief and two affidavits in opposition. Furthermore, when the Government was provided the opportunity to present oral argument on its motions, it indicated that it did not wish to do so. *See* Letter from Robert DeBerardine, Esq., to Hon. John M. Walker, dated July 20, 1988. Knowing this, plaintiffs still specifically requested oral argument, *id.*, actions that spoke louder than the words they used in their request for sanctions. *Cf. Oliveri,* 803 F.2d at 1280 (denying sanctions when "defendants waited until after jury selection before moving to dismiss those claims they now urge to be so patently frivolous as to require sanctions for merely asserting them").[14]

It is not enough that plaintiffs subjectively perceived the Government's arguments to have been unpersuasive, even manifestly so. *See Eastway,* 762 F.2d at 253. The relevant inquiry was whether the proper disposition was so overwhelmingly clear that no reasonable attorney could have concluded that the target motion had any chance of success. *Id.* Plaintiffs misguidedly believed that the ambiguities in the Act were so clearly outweighed by indirect evidence in the legislative history and the lone opinion of another jurisdiction that a second court passing on the matter could not possibly have disagreed with their analysis. The depth of analysis in this opinion attests to the fact that this court, at least, did not find the answer to be that obvious.

Plaintiffs' request is not protected by the lenient standards governing the review of target motions in a typical Rule 11 determination. As noted above, those standards are designed to foster the creativity necessary for effective advocacy on the merits of a case. *See Eastway,* 762 F.2d at 254. There is no reason to encourage creativity in formulating Rule 11 requests. If anything, such litigation should be discouraged since it only detracts from "the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1. In this case the Government had to seek an additional three days to respond specifically to the request for sanctions. *See* Letter from Helen M. Toor, Esq., to Hon. John M. Walker, Jr., dated July 25, 1988. The response covered five of the nineteen pages of the Government's reply brief. The Office of the United States Attorney can no more afford the time to respond to meritless motions than can any other law firm or business. Forcing it to devote any time to this frivolous request for sanctions caused a regrettable waste of resources, precisely the type of result that Rule 11 was designed to avoid.

In addition, requests for sanctions necessarily carry with them accusations of

---

**14.** Once plaintiffs requested argument, the government attended and argued not only in support of its motions but in opposition to the Rule 11 motion. Counsel for plaintiffs chose not to address the Rule 11 issue and stood silently when the Government rhetorically asked whether plaintiffs were still pressing the point. By this time, plaintiffs were aware of the merit of the Government's subsection (i) argument. Had they declined an *express* request to withdraw the motion at this point, they would have independently violated Rule 11 for pursuing a motion after learning that it had become groundless. *Calloway,* 854 F.2d at 1472.

wrongdoing on the part of an attorney, which can breed personal animosity between counsel. *Cf. Oliveri*, 803 F.2d at 1280 (stating that "[c]ourts should be sensitive to the impact of sanctions on attorneys. They can be economically punishing, as well as professionally harmful"). Memorializing attacks upon the competence or integrity or another lawyer in a Rule 11 request only reduces the opportunities for future cooperation. In this case, for example, plaintiffs stated that "the sole purpose of this motion is to delay prosecution of this action." Pl. Mem. at 23. They further commented that "[i]t is, to put it mildly, extremely questionable whether the Government's motion to stay this action ... was made in good faith." *Id.* at 25. In fact, the conduct of the Assistant on this matter has been nothing less than exemplary. Her well-reasoned arguments certainly provided no hint of the improper motives that plaintiffs have tried to impute. Allowing adversaries an unrestricted ability to initiate a process in which competent attorneys must justify, under the threat of sanctions, actions taken in good faith, does not serve the purposes of Rule 11. The Rule was intended to reduce, rather than contribute to, such abuse of the legal system. That is why requests for sanctions must be treated seriously and controlled appropriately.

A request for sanctions under Rule 11 is not a tactical device. Asserting a request for strategic reasons when there is any colorable argument supporting an adversary's position constitutes an "improper purpose" within the meaning of the Rule. When a substantive motion is involved, courts are best able to rule on requests for sanctions after deciding the underlying motion. *See* Fed.R.Civ.P. 11 advisory committee's notes to 1983 amendment (stating that requests for sanctions will be determined "in the case of motions at the time when the motion is decided or shortly thereafter"). Attorneys who choose to submit marginal requests for sanctions before that time, in the misguided hope that they will help persuade the court on the merits, run a risk of violating the Rule. No matter when a request is made, however, if, as in this case, it is patently clear at its inception that it is doomed to fail, pursuing it will constitute an independent violation of the Rule, mandating the imposition of appropriate sanctions. *See Eastway*, 762 F.2d at 254.

### CONCLUSION

For the reasons discussed above, the Government's motions to dismiss and stay and plaintiffs' request for sanctions are denied. Plaintiffs are ordered to submit to the Government and the court, within ten days of the date of this opinion, a list of proposed deposition witnesses and anticipated areas of inquiry. The Government must notify the court of any objections to plaintiffs' submission within five days after their receipt, and may do so *in camera* if desired. Discovery is stayed until such time as the court issues appropriate protective orders and, if necessary, schedules a conference to establish the parameters of discovery. The Government may submit certain pleadings *in camera* under the conditions described in the sealed addendum to this opinion. If warranted, the court may then grant leave to the Government to renew its application for a stay.

The court finds counsel for plaintiffs to be in violation of Rule 11 and orders them to compensate the Government for the costs, including attorney's fees, reasonably incurred in responding to the request for sanctions. Accordingly, the Government is ordered to submit to plaintiff and the court, within ten days of the date of this opinion, an accounting of its expenses. If plaintiffs have any objections to the Government's estimate they must file them within five days of their receipt.

So Ordered.