# United States Court of Appeals
## For the First Circuit

No. 99-1447

CARIBE INDUSTRIAL SYSTEMS, INC.,

Plaintiff, Appellant,

v.

NATIONAL STARCH AND CHEMICAL COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Perez-Gimenez, U.S. District Judge]

Before

Lynch, Circuit Judge,

Campbell, Senior Circuit Judge,

and O'Toole, District Judge.[*]

Eric Perez-Ochoa, with whom Anabelle Rodriguez Rodriguez and Martinez Odell & Calabria were on brief for appellant.
Jaime E. Toro-Monserrate, with whom McConnell Valdes was on brief for appellee.

[*]Of the District of Massachusetts, sitting by designation.

May 8, 2000

**CAMPBELL,** <u>**Senior Circuit Judge**</u>**.** Plaintiff-appellant Caribe Industrial Systems Inc. ("Caribe") sued its principal, defendant-appellee National Starch and Chemical Company ("National"), under the Puerto Rico Dealer's Act. The district court dismissed Caribe's complaint for failure to state a claim, holding that National did not violate the Dealer's Act by selling goods directly to Checkpoint Systems, Inc. ("Checkpoint"), a company with which Caribe had been dealing. We affirm the decision below, although on different grounds than those stated by the district court.

## I.  BACKGROUND

In its complaint, Caribe alleges the following facts: National manufactures adhesive products, which are sold through a network of distributors. Caribe is a Puerto Rican distributor that markets and sells industrial packaging machinery and materials, including adhesive products.

On August 1, 1983, Caribe and National entered into a written Distributor Agreement ("the Agreement"), wherein National agreed to supply and Caribe agreed to distribute certain adhesive products in a designated territory. Caribe agreed to be a "non-exclusive" distributor of National's product

-2-

line in Puerto Rico. The Agreement provided in Article 2 that "Distributor's territory shall be non-exclusive territory."[2] The Agreement further provided, in Article 7, that "National reserves the right to sell the Products directly to its customers." Notwithstanding the non-exclusivity provisions, Caribe was the sole distributor of National's products in Puerto Rico for approximately fourteen years.

Beginning in 1993, Caribe sold National's "hot melt" adhesive products to Checkpoint. Caribe obtained Checkpoint's business through its promotional and marketing efforts, and its sales to Checkpoint represented approximately sixty percent of Caribe's total sales of adhesives. In December 1996, Checkpoint and Caribe executed an open-ended purchase order that terminated in December 1997.

In or around March of 1997, Checkpoint informed Caribe that it intended to locally manufacture the hot melt adhesives that it had been purchasing from Caribe. Caribe attempted to dissuade Checkpoint from doing so. On or around March 26, 1997,

---

[2]The Agreement was attached as an exhibit to Caribe's complaint in this action, and so we consider it incorporated by reference. Although the parties mention other documents beyond the complaint and Agreement, the district court apparently did not consider any such materials, and nor will we. See Fed. R. Civ. P. 12(b); 5A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1366 (2d ed. 1990) (consideration of matters outside pleadings converts Rule 12(b)(6) motion into summary judgment motion).

Caribe met with Checkpoint to "discuss the situation and to attempt to discourage [Checkpoint] from manufacturing the products." Checkpoint stated at this meeting that it had already ordered equipment to manufacture the adhesives. Hence, Caribe and Checkpoint were unable to reach agreement.

Caribe notified National of Checkpoint's plans. National initially expressed skepticism as to Checkpoint's ability to manufacture its own adhesives. Together, Caribe and National "attempted to seek economically viable alternatives that would convince Checkpoint not to engage in the manufacturing of hot melt adhesives. . ." In or around April 1997, National told Caribe that in response to Checkpoint's actions, it wished to lower its prices. Caribe responded by offering to reduce its profits to make its products more economically attractive to Checkpoint, and to exclude the Checkpoint account from the distributorship arrangement. Caribe drafted and sent a "Memorandum of Understanding" to National setting forth these proposals. National rejected Caribe's proposals, asking Caribe to take a larger cut in profits instead. Caribe refused to do so.

National and Checkpoint met in May, 1997, to discuss Checkpoint's announcement that it would be making adhesives in-house. At this time, National became convinced that Checkpoint

-4-

indeed had the capacity to manufacture its own adhesives. On June 26, 1997, National told Caribe that it had met privately with Checkpoint earlier that month. At that meeting, National and Checkpoint had agreed that instead of manufacturing the adhesives itself, Checkpoint would buy them directly from National, omitting Caribe from the distribution chain.

In June, 1997, Checkpoint told Caribe that effective June 30, 1997, it would be buying materials directly from National without an intermediary. Checkpoint agreed, however, to honor a ninety-day cancellation clause in the open-ended purchase order. On July 25, 1997, Checkpoint sent another letter "officially" terminating the purchase order. Checkpoint bought hot melt adhesives directly from National beginning in September or October, 1997.

On September 29, 1997, Caribe filed a complaint in the federal district court for the District of Puerto Rico against National, seeking damages and provisional relief pursuant to the Puerto Rico Dealer's Act of June 24, 1964 ("Law 75"), P.R. Laws Ann. tit. 10, § 278 et seq. Caribe contended that National violated Law 75 by performing acts detrimental to the established relationship between the parties by setting up its own distribution system directly with Checkpoint.

On October 29, 1997, National filed a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). National contended that it did nothing wrong by entering a direct relationship with Checkpoint, because Checkpoint had already terminated its customer relationship with Caribe and the Agreement was non-exclusive. Caribe opposed the motion to dismiss and amended its complaint to add a cause of action for tortious interference with a contractual relationship.

On February 23, 1999, the district court allowed National's motion to dismiss, although based on somewhat different reasoning than that advanced by National. See Caribe Indus. Sys., Inc. v. National Starch & Chem. Co., 36 F. Supp. 2d 448 (D.P.R. 1999). It characterized the issue before it as "whether a non-exclusive distribution agreement under Law 75, although flexible to allow multiple distributors, nevertheless forbids the principal from supplying its products directly to the customers of its own distributors." Id. at 450. It concluded that no cause of action lies under Law 75 where a principal sells directly to a customer of a non-exclusive dealer. The district court also held that Caribe did not state a claim for tortious interference with a contractual relationship. Caribe appeals.

-6-

**II      DISCUSSION**

We apply "a de novo standard of review to a district court's allowance of a motion to dismiss for failure to state a claim." New England Cleaning Servs., Inc. v. American Arbitration Ass'n, 199 F.3d 542, 544 (1st Cir. 1999) (citation omitted). Caribe contends that the district court incorrectly applied Rule 12(b)(6) in that it failed to take as true the allegation that Checkpoint was Caribe's customer, not National's customer. In Caribe's view, this distinction made it improper for National to sell directly to Checkpoint, notwithstanding the Agreement's non-exclusivity. Caribe contends that the provision in Article 7 stating that "National reserves the right to sell the Products directly to its customers" (emphasis supplied) should be read as limiting National's sales to those who are not the customers of its distributors. In support of that argument, Caribe suggests that Checkpoint remained its customer even after Checkpoint announced its intention to discontinue purchasing product from Caribe. Caribe further argues that the court misapplied controlling case law in concluding that National did not perform any acts detrimental to the established relationship between the parties.

Puerto Rico's Law 75 governs the business relationship between principals and the locally appointed distributors who

market their products. See Irvine v. Murad Skin Research Labs., Inc., 194 F.3d 313, 317-18 (1st Cir. 1999). In order to avoid the inequity of arbitrary termination of distribution relationships once the distributor has developed a local market for the principal's products or services, Law 75 limits the principal's ability to unilaterally end the relationship except for "just cause." P.R. Laws Ann. tit. 10, § 278a. In 1966, the protection afforded to distributors under Law 75 was extended to include the conduct of a principal "detrimental to the established relationship," even where the contract was not terminated. See id.; see also Irvine, 194 F.3d at 317-18.

In the present case, National did not terminate Caribe's status as a distributor of its products. The sole issue is whether National engaged in conduct detrimental to the distribution relationship. See P.R. Laws Ann. tit. 10, § 278a.[3] "The question whether there has been a 'detriment' to the existing relationship between supplier and dealer is just another way of asking whether the terms of the contract existing between the parties have been impaired." Vulcan Tools of Puerto Rico v. Makita U.S.A., Inc., 23 F.3d 564, 569 (1st Cir. 1994).

_____

[3]Section 278a provides: "Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship . . ."

Hence, the parameters of Caribe's Law 75 rights, as the district court correctly noted, are established by the terms of Agreement. "[T]he 'established relationship' between dealer and principal is bounded by the distribution agreement, and therefore the Act only protects against detriments to contractually acquired rights." Id. (citation omitted).

The district court framed Caribe's legal argument as follows:

> (1) Even if Caribe has a non-exclusive distributorship agreement with National, National cannot sell directly to Caribe's clients. (2) Checkpoint would have never ceased purchasing adhesives from Caribe had National never offered them directly to Checkpoint. (3) National's appropriation of Caribe's clientele violates Puerto Rico's Law 75.

Caribe Indus. Sys., Inc., 36 F. Supp. 2d at 450. The court went on to state, "Since the second step of the progression is inherently a question of fact, for purposes of resolving this motion to dismiss it shall be assumed that had it not been for National's direct selling efforts, Checkpoint would have remained as Caribe's customer." Id. The district court then concluded that Caribe had no cause of action for impairment under Law 75 because the Agreement established a non-exclusive distribution arrangement and permitted National to sell directly to its customers. Id. at 450-51.

We disagree that the facts set forth in the complaint support an inference that Checkpoint would never have stopped purchasing adhesives from Caribe had National not made direct selling efforts. What is plain from the pleaded facts is that Checkpoint had made clear that it would no longer purchase adhesives from Caribe -- i.e., that Checkpoint effectively announced its plans to end its existing customer relationship with Caribe -- before it entered a new arrangement to purchase products directly from National.

According to the allegations in the complaint, Checkpoint informed Caribe that it intended to locally manufacture its own hot melt adhesives in March of 1997. This assertion was further supported at a meeting on March 26, 1997, when Checkpoint told Caribe that it had already ordered equipment to manufacture the adhesives. Caribe's efforts at that meeting to dissuade Checkpoint failed. Thus, it was clear at this point that unless Checkpoint somehow could be persuaded to reconsider its new, in-house plans, Caribe's status as a dealer supplying Checkpoint with National's product was at an end. Caribe obviously recognized this; otherwise, there would have been no need, in Caribe's own words, for Caribe to

"attempt[] to convince Checkpoint . . . to continue to buy product from them."[4]

National did not enter into its own arrangement with Checkpoint until May or June of 1997. National's arrangement occurred some months <u>after</u> Checkpoint had informed Caribe that it had already purchased manufacturing equipment, thus making it plain that it would no longer need to buy hot melt adhesives from Caribe. There are no facts pleaded in the complaint to suggest that National initiated action to steal Checkpoint's ongoing business away from Caribe.

Caribe argues that we should infer that Checkpoint would not have ended its customer relationship with Caribe had National not "persuaded" Checkpoint to enter into a direct relationship. This, however, cannot be reasonably inferred from Caribe's pleaded facts. <u>See</u> <u>Correa-Martinez</u> v. <u>Arrillaga-Belendez</u>, 903 F.2d 49, 58 (1st Cir. 1990) (no need to strain against plausibility in construing complaint). Those facts indicate that Checkpoint had already communicated that it would no longer proceed with its relationship with Caribe. It

_____

[4]Caribe argues that National also was involved in efforts to convince Checkpoint not to manufacture its own adhesives and continue purchasing National products from Caribe. It is true that Caribe pleaded these facts in its complaint, but we fail to see how these facts contravene a conclusion that Checkpoint had already made clear that it would be discontinuing its existing purchasing arrangement with Caribe.

is entirely conjectural that, had National stayed out of the picture, Caribe eventually could have negotiated terms with Checkpoint sufficiently attractive for Checkpoint to have abandoned its stated plans to manufacture its own adhesives. Thus, while we take as true that Checkpoint once had been Caribe's customer, we must conclude that Checkpoint effectively ceased to be its customer after Checkpoint announced its in-house manufacturing plans.

In these circumstances, we see no provision in the Agreement that prohibited National's direct sales to Checkpoint. The only potentially relevant provision is Article 7, which permits National to sell to "its customers." Under this language, it might be argued (whether or not correctly, we need not decide) that a company that was purchasing National's materials from a distributor could not be also a "customer" of National (viz. because it was already the distributor's customer). Under that theory, the Agreement arguably might be ambiguous as to whether it prevented National from dealing directly with Checkpoint while the latter remained Caribe's customer.

But here, as noted, the complaint makes it abundantly plain that Checkpoint had already effectively ended its existing customer relationship with Caribe. Hence, nothing in the terms

-12-

of the Agreement prohibited National from entering a new arrangement with Checkpoint. Under these circumstances, National's actions cannot be found to have violated the Agreement so as to impair Caribe's relationship with Checkpoint.[5] See Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp., 963 F. Supp. 1342, 1351-52 (S.D.N.Y. 1997) (where customer independently decided to stop purchasing products from distributor, principal did not cause detriment within meaning of Law 75).

Since there has been no impairment of the terms of the contract, there is no Law 75 liability. See Vulcan Tools, 23 F.3d at 569. Accordingly, we affirm the district court, although on the narrower grounds set forth.[6] We need not reach,

---

[5]The only "impairment" Caribe can conceivably assert is to its hope that Checkpoint would still change its mind, despite the fact that Caribe's efforts at persuasion were theretofore unsuccessful. Caribe's argument boils down to saying that its prior customer relationship with Checkpoint gave it some sort of right, notwithstanding the Agreement's non-exclusivity, to act exclusively for National in seeking to recapture Checkpoint's business. Under this approach, if Caribe were not able to persuade Checkpoint to purchase National's product through it, then National would have no recourse but to accept the loss of Checkpoint's business. We see nothing in the terms of the Agreement that imposes such an extreme restriction on National's right to sell directly. Cf. Vulcan Tools, 23 F.3d at 569. We cannot read the "its customers" language as implying such a sweeping barrier given the language's lack of explicitness and the non-exclusivity provisions elsewhere in the Agreement.

[6]Initially, Caribe made the additional argument that it was entitled to a presumption of impairment under Section 278a-1(b)

and do not now decide, the broader question addressed by the district court, i.e. whether National could have sold goods directly to Checkpoint at a time when Checkpoint was Caribe's ongoing customer.

Finally, Caribe does not argue on appeal that the district court erred in dismissing its claim of tortious interference with a contractual relationship. Accordingly, we affirm the dismissal of that claim as well.

Affirmed.

---

of Law 75 by alleging that National engaged in private meetings with Checkpoint that resulted in a direct selling arrangement. National pointed out that the 1988 amendments to Law 75 that established the relevant presumption do not apply to preexisting contracts such as the one between it and Caribe. Caribe concedes this point in its reply brief, and we need not deal with it further.