**CARIBBEAN WHOLESALES AND SERVICE CORPORATION,** Plaintiff,

v.

**U.S. JVC CORPORATION, Defendant.**

**No. 93 CIV. 8179(PKL).**

United States District Court, S.D. New York.

June 22, 2000.

Law Offices of Norman L. Faber, New York City, Norman L. Faber, of counsel, Woods & Woods, Hato Rey, PR, Harry Woods, of counsel, Fernando Gallardo, of counsel, for Plaintiff.

Golenbock, Eiseman, Assor & Bell, New York City, Richard S. Taffet, of counsel, Jacqueline G. Veit, of counsel, for Defendant.

### *OPINION AND ORDER*

LEISURE, District Judge.

In this diversity action, originally removed from the Superior Court of Puerto Rico to the District Court of Puerto Rico and later transferred to this Court, plaintiff Carribean Wholesales and Service Corporation ("CWS") seeks relief against defendant U.S. JVC Corporation ("JVC") under Puerto Rico's Dealer's Contracts Act, P.R. Laws Ann. tit. 10, § 278 *et seq.*, commonly known as Law 75. Before the Court are JVC's renewed motion for summary judgment, pursuant to Fed.R.Civ.P. 56(b), and CWS's cross-motion for sanctions, pursuant to Fed.R.Civ.P. 11(c). For the reasons stated below, JVC's motion is granted and CWS's motion is denied.

### BACKGROUND

The substantive facts and procedural history of this case have been set forth in greater detail in this Court's May 12, 1997 Opinion and Order, *Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp.,* 963 F.Supp. 1342, 1345–49 (S.D.N.Y.1997), with which general familiarity is presumed. In that decision, the Court denied JVC's motion for summary judgment with respect to CWS's claim of impairment by direct sales, *see id.* at 1352–53, but granted the motion in all other respects, *see id.* at 1360. Consequently, the sole remaining basis for CWS's cause of action is its allegation that JVC sold audio products directly to a former CWS customer, BWAC International ("BWAC"), in violation of Law 75. *See* Am. Compl. ¶ 13(a).

CWS and JVC enjoyed an amicable and prosperous relationship for nearly a decade. In September 1981, the parties entered into a distributorship agreement (with its annual renewal agreements, collectively, the "Agreement"), whereby CWS was appointed a non-exclusive wholesale distributor of JVC's products—including audio and video electronics equipment—in Puerto Rico. *See Caribbean,* 963 F.Supp. at 1345. The parties renewed the Agreement annually until 1993, when JVC formally terminated CWS's distributorship. *See id.* at 1345.

BWAC began buying JVC products through CWS in 1987, and soon grew to become CWS's most important account. *See id.* However, when Gabriel Villani became BWAC's Executive Vice President on January 1, 1990, he, along with M.L. Daniel of BWAC's then-parent company Transamerica, decided to stop buying JVC products from CWS and instead join a purchasing group that would suit BWAC's specific price, product, and administrative needs. *See id.* at 1346 & n. 2. This Court previously determined that BWAC made its decision to end its relationship with CWS independent of any persuasion by JVC. *See id.* at 1352.[1] Absent new eviden-

---

1. The Court found "no evidence that BWAC's decision [to cease buying from CWS] was induced or influenced by any communication or other affirmative act on JVC's part." *Id.*

tiary material raising some dubiety to the contrary, that finding may not be disturbed, for it is the law of the case. *See Catanzano v. Wing*, 103 F.3d 223, 230 n. 5 (2d Cir.1996).

By March 1990, CWS's sales of JVC merchandise to BWAC had declined significantly. *See Caribbean*, 963 F.Supp. at 1346. Soon after, BWAC began buying video equipment through MARTA Cooperative of America, Inc. ("MARTA"), a mainland purchasing group, and so informed CWS in or around June of 1990. *See id.* Yet, because JVC audio products[2] were not available through MARTA, in the summer of 1990,[3] BWAC arranged to purchase audio equipment directly from JVC. While it was originally CWS's contention that JVC offered BWAC lower prices than it charged CWS for the same products, BWAC actually paid substantially higher prices than did CWS. *See Caribbean*, 963 F.Supp. at 1346. Still, CWS almost certainly added a mark-up to cover overhead and profit, which would have increased the price CWS charged BWAC to an amount higher than what BWAC paid directly to JVC. *See id.* at 1353 n. 24. In fact, Villani confirms that JVC's prices were lower than CWS's. *See id.* (citing Faber Aff., Exh. 16, at 66).

CWS's sole remaining claim under Law 75 alleges that JVC impaired the parties' established distribution relationship by selling audio equipment directly to BWAC, thereby bypassing CWS entirely. In its earlier summary judgment opinion, the

Court found "evidence in the record that could reasonably lead a jury to infer that JVC performed acts that directly or indirectly caused BWAC to decide not to resume purchasing from CWS once it learned that JVC audio products could not be obtained from MARTA." *Id.* at 1352. It therefore concluded that JVC had failed to rebut the statutory presumption, under P.R. Laws Ann. tit. 10, § 278a–1(b)(1), that the parties' relationship was impaired by its "establish[ment of] facilities in Puerto Rico for the direct distribution of merchandise." *Caribbean*, 963 F.Supp. at 1352–53.

JVC now effectively challenges the Court's prior ruling that "a jury could conclude that JVC's participation in such negotiations constituted an action directly or indirectly contributing to the establishment of facilities for direct distribution in Puerto Rico." *Id.* at 1353. Its argument is based on two recent decisions of the United States District Court for the District of Puerto Rico, *Innovation Mktg. v. Tuffcare Inc.*, 31 F.Supp.2d 218 (D.P.R.1998), and *Caribe Indus. Sys., Inc. v. National Starch & Chem. Co.*, 36 F.Supp.2d 448 (D.P.R.1999), *aff'd*, 212 F.3d 26, 31 (1st Cir.2000), which JVC claims compel the dismissal of CWS's claim. In response, CWS characterizes JVC's renewed motion as "an attempt to ignore or gloss-over" the Court's previous findings regarding JVC's negotiations with BWAC. *See* Pl. Opp. Mem. at 5 (citing *Caribbean*, 963 F.Supp. at 1353). CWS argues further that JVC's

---

Rather, "Villani and Daniel seem simply to have decided that the prices BWAC was paying were too high, and that other sources should be sought." *Id.*

**2.** As of 1989, BWAC's purchases of JVC audio products from CWS represented approximately 60% of its total purchases of JVC merchandise. *See id.* at 1346 n. 4.

**3.** The Court's prior decision recognized that "[t]he exact date when negotiations for direct sales of audio product commenced is unclear." *Id.* at 1346 n. 6. JVC offers evidence that its direct sales to BWAC did not commence until November 1990. *See* Taffet Aff.,

Exh. A. Nonetheless, CWS continues to assert that JVC and BWAC met to discuss and negotiate arrangements for direct sales "in the summer of 1990." *Caribbean*, 963 F.Supp. at 1346 n. 6 (citing various affidavits).

There is still no evidence that establishes conclusively when such negotiations commenced. As such, because the Court must construe all evidence in the light most favorable to CWS and draw all reasonable inferences in its favor, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), it must be assumed, for the purposes of this motion, that these negotiations began in the summer of 1990.

motion is unwarranted because this Court has previously considered all of the authority cited by JVC in its memorandum of law, with the exception of *Innovation* and *Caribe,* and has deemed it "unavailing." *Caribbean,* 963 F.Supp. at 1353 n. 25.

## DISCUSSION

### I. Summary Judgment Standard

A moving party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 128 (2d Cir.1996). Though they are equally applicable here, because the oft-cited standards for summary judgment have been set forth in detail in the Court's previous Opinion and Order, *see Caribbean,* 963 F.Supp. at 1351, they need not be repeated at this juncture.

 Although a party may renew its motion for summary judgment "as long as it is supported by new material," *Twin Labs., Inc. v. Weider Health & Fitness,* 720 F.Supp. 31, 34 (S.D.N.Y.1989), *aff'd,* 900 F.2d 566 (2d Cir.1990); *see also Whitford v. Boglino,* 63 F.3d 527, 530 (7th Cir.1995), the Court retains discretion to determine the scope of its reconsideration, *see Warner Bros., Inc. v. American Broad.*

*Cos., Inc.,* 720 F.2d 231, 245 (2d Cir.1983); *Corporacion de Mercadeo Agricola v. Mellon Bank Int'l,* 608 F.2d 43, 48 (2d Cir. 1979). The Court may grant a revived motion "upon a showing of good cause." 10A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2717, at 299 (1998); *see also id.* § 2718, at 303. Nonetheless, district courts must heed the Second Circuit's direction to "balance the need for finality against the forcefulness of any new evidence and the demands of justice." *Corporacion de Mercadeo,* 608 F.2d at 48; *see also Dictograph Prods. Co. v. Sonotone Corp.,* 230 F.2d 131, 137 (2d Cir.1956) (L.Hand, J.).

The cases cited by JVC clearly reflect new developments of controlling law not previously available for the Court's consideration. Because the law is constantly evolving, "a new decision clarifying the applicable substantive law may justify re-examining a denial of summary judgment." *Lavespere v. Niagara Mach. & Tool. Works,* 910 F.2d 167, 185 (5th Cir.), *reh'g denied,* 920 F.2d 259 (5th Cir.1990), *abrogated on other grounds, Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 n. 14 (5th Cir.1994) (en banc); *see also Bush Dev. Corp. v. Harbour Place Assocs.,* 632 F.Supp. 1359, 1366 (E.D.Va.1986). Thus, while this Court is not bound to follow an interpretation of local law enunciated by a district judge sitting in the jurisdiction, *see Carolco Pictures Inc. v. Sirota,* 700 F.Supp. 169, 171 (S.D.N.Y.1988), it is undoubtedly wise to defer to the expertise of a local court.[4] Judges sitting in Puerto

4. *See Factors Etc., Inc. v. Pro Arts, Inc.,* 652 F.2d 278, 283 (2d Cir.1981) ("Where, as here, the pertinent court of appeals has essayed its own prediction of the course of state law on a question of first impression within that state, the federal courts of other circuits should defer to that holding, perhaps always, and at least in all situations except the rare instance when it can be said with conviction that the pertinent court of appeals has disregarded clear signals emanating from the state's highest court pointing toward a different rule."); *Lomartira v. American Auto. Ins. Co.,* 371 F.2d 550, 554 (2d Cir.1967) ("In a case like this one, where a question of state law must be determined in a diversity case, great weight should be given the determination of a district judge sitting in that state."); 19 Charles A. Wright & Arthur R. Miller, *supra* § 4507, at 211 (1996) ("As a general proposition, a federal court judge who sits in a particular state, especially one who has practiced before its courts, may be better able to resolve complex questions as to the law of that state than is a federal judge who has no such personal acquaintance with the law of the state."). *But cf. Salve Regina College v. Russell,* 499 U.S. 225, 239, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) (requiring federal appellate courts to

Rico—and particularly members of the United States District Court for the District of Puerto Rico—enjoy much greater familiarity and expertise than this Court with regard to such esoteric issues of Puerto Rico law. Likewise, the United States Court of Appeals for the First Circuit, which reviews the decisions of the Puerto Rico district court, necessarily has great familiarity with Law 75. Finally, it is particularly prudent for the Court to defer to local expertise in this case, given the unique nature of Puerto Rico law. *See Oliveras–Salas v. Puerto Rico Highway Auth.*, 884 F.2d 1532, 1534–35 (1st Cir. 1989) ("When we are faced with a question involving the proper construction of Puerto Rico law, we accord respect to the district judges who are citizens of Puerto Rico and well versed in the Spanish underpinnings of Puerto Rico law."); *Motor Sport, Inc. v. Harley–Davidson Motor Co.*, 39 F.Supp.2d 140, 142 (D.P.R.1999) (suggesting that the Puerto Rico district court is "more familiar" with Law 75 issues than a Wisconsin district court); *In re Developers of Caguas, Inc.*, 26 B.R. 977, 980 (Bankr. E.D.N.Y.1983) (transferring venue, having concluded that critical issues "can best be decided by a court knowledgeable as to Puerto Rican conditions").

Had the Court been able to consider these two cases in resolving JVC's original summary judgment motion, it might have been afforded a different perspective on the material issues. *See Lavespere*, 910 F.2d at 185. Thus, renewal of JVC's motion is appropriate.[5]

## II. The *Innovation* and *Caribe* Decisions

Puerto Rico's Law 75 "governs the business relationship between principals and the locally appointed distributors/dealers for marketing their products." *Irvine v.*

---

review *de novo* state law determinations of inferior district courts).

**5.** It should be noted, however, that JVC may not revisit past Court findings unless they relate to new law that did not exist at the time

*Murad Skin Research Labs., Inc.*, 194 F.3d 313, 317 (1st Cir.1999). In 1966, the Puerto Rico legislature amended the statute to provide that "[n]otwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause." P.R. Laws Ann. tit. 10, § 278a. To demonstrate the impairment of an "established relationship," CWS must show a detriment to a contractually acquired right, as defined by its Agreement with JVC. *See Irvine*, 194 F.3d at 318 ("The protection afforded dealers by Law 75 ... is circumscribed by those rights acquired under the agreement regulating their business relationship. Therefore, whether or not an impairment has taken place will depend on the specific terms of the distribution contract."); *Vulcan Tools v. Makita USA, Inc.*, 23 F.3d 564, 569 (1st Cir.1994) ("[T]he 'established relationship' between dealer and principal is bounded by the distribution agreement, and ... therefore [Law 75] only protects against detriments to contractually acquired rights."); *id.* ("The question whether there has been a 'detriment' to the existing relationship ... is just another way of asking whether the terms of the contract ... have been impaired."); *see also* P.R. Laws. Ann. tit. 10, § 278a–1(b)(2) (creating a presumption of impairment of an existing relationship "when the principal ... establishes a distribution relationship with one or more additional dealers ... in conflict with the contract existing between the parties").

## A. Law 75 and Non–Exclusive Agreements

The First Circuit has held that a manufacturer's appointment of additional dis-

---

of the initial denial of summary judgment. *Cf. Keehan v. Keehan*, No. 96 Civ. 2481, 2000 WL 502854, at *3 (S.D.N.Y. Apr. 25, 2000) (Leisure, J.).

tributors in Puerto Rico does not impair an "established agreement" with an existing distributor if the parties' relationship was non-exclusive. *See Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo Inc.,* 96 F.3d 10, 15–16 (1st Cir.1996); *Vulcan,* 23 F.3d at 569; *see also Harley–Davidson Motor Co. v. Motor Sport, Inc.,* 6 F.Supp.2d 996, 1001 (E.D.Wis.1998); *Santiago v. Canon U.S.A., Inc.,* Civ. No. 93–2225, 1997 WL 188453, at \*3 (D.P.R. Mar.7, 1997), *aff'd,* 138 F.3d 1 (1st Cir. 1998). In November 1998, the United States District Court for the District of Puerto Rico extended this proposition by denying provisional relief to a non-exclusive sales representative aggrieved by its principal's decision to sell products directly to Puerto Rican customers through a wholly-owned subsidiary. *See Innovation,* 31 F.Supp.2d at 220, 223. Thus, in Law 75 cases, "[t]he exclusive or nonexclusive nature of the contract between [the manufacturer and the distributor] is critical because 'whether or not an impairment [under Law 75] has taken place will depend upon the specific terms of the distribution contract.' " *Twin County Grocers, Inc. v. Mendez & Co.,* 81 F.Supp.2d 276, 286 n. 6 (D.P.R.1999) (quoting *Irvine,* 194 F.3d at 318–19); *cf. Newell P.R., Ltd. v. Rubbermaid Inc.,* 20 F.3d 15, 23 (1st Cir.1994) (upholding jury verdict for exclusive distributor based in part on evidence of supplier's direct sales to retail stores); *Orba, Inc. v. MBR Indus., Inc.,* 49 F.Supp.2d 67, 71 (D.P.R.1999) ("[A] jury could find that MBR had impaired the relationship with Orba when it sold directly in Puerto Rico through house accounts *if the jury had previously found that the Agreement between them furnished exclusivity upon Orba.*") (emphasis added).

There can be no question that CWS and JVC enjoyed a non-exclusive relationship. *Cf. Graphics Supply Inc. v. Polychrome Corp.,* 116 F.3d 464, 1997 WL 351637, at \*2 (1st Cir. June 23, 1997). In fact, the Agreement's first paragraph stated unambiguously:

JVC hereby appoints [CWS] as a *non-exclusive distributor* for the warehousing and resale to retailers of the JVC products set·forth on the Schedule of Products annexed hereto . . . as said schedule may from time to time be deleted from, amended or modified or Products substituted by JVC . . . . *Nothing herein contained shall be construed as granting to [CWS] an exclusive right* to sell the Products, it being understood by [CWS] that the rights herein granted shall be on a *non-exclusive basis.*

Taffet Aff., Exh. B, ¶ 1 (emphasis added). Moreover, subparagraph 5(c)(v) further provided that "JVC [had] the right . . . at any time to effect changes in . . . or reallocate the distribution of any of its Products . . . without incurring any liability to [CWS]," *id.* ¶ 5(c)(v), and paragraph 5(f) confirmed that "[n]o territory [was] assigned exclusively to [CWS] by JVC," and "reserve[d] [JVC's] absolute·right to increase or decrease the number of DISTRIBUTORS in [CWS's] primary area of responsibility or elsewhere, at any time without notice to [CWS]," *id.* ¶ 5(f). Nowhere did the Agreement require that JVC use distributors to market its products in Puerto Rico, nor did it prohibit JVC from selling directly to Puerto Rican customers. *Cf. Twin County,* 81 F.Supp.2d at 285 (" 'The law imposes no prohibition upon the principal of selling or establishing parallel distributorship agreements if he reserved the right to do so.' ") (quoting *General Office Prods. Corp. v. Gussco Mfg., Inc.,* 666 F.Supp. 328, 331 (D.P.R.1987)).

Although non-exclusive distributors are entitled to protection under Law 75, the statute "does not operate to convert non-exclusive distribution contracts into exclusive distribution contracts." *Vulcan,* 23 F.3d at 569; *see also Nike Int'l, Ltd. v. Athletic Sales, Inc.,* 689 F.Supp. 1235, 1238 (D.P.R.1988) ("[T]he legislature did not intend that Law 75 be a safe haven for dealers to avoid the express terms of the contracts to which they willingly sub-

scribed ....."). Therefore, CWS must identify specific terms of the Agreement that JVC violated in order to demonstrate that JVC's actions impaired a contractually acquired right. *See Vulcan,* 23 F.3d at 569. Absent such a showing, the Court must grant summary judgment in favor of JVC.

## B. Direct Sales to BWAC

■ In its earlier decision, this Court dismissed CWS's claims arising from BWAC's participation in MARTA, having found "no evidence that BWAC's decision was induced or influenced by any communication or other affirmative act on JVC's part." *Caribbean,* 963 F.Supp. at 1352. By contrast, the Court concluded that JVC's "direct sales to BWAC stand on a different footing than the sales through MARTA, because there is evidence in the record that could reasonably lead a jury to infer that JVC performed acts that directly or indirectly caused BWAC to decide not to resume purchasing from CWS once it learned that JVC audio products could not be obtained from MARTA." *Id.* at 1353.

Moreover, in a footnote, the Court addressed JVC's defense that regardless of their effect on CWS, its "direct sales [we]re equivalent to the creation of additional dealerships under Law 75, and thus a non-exclusive dealer cannot complain of either action." *Id.* at 1352 n. 25. The Court deemed JVC's argument "unavailing because the issue is not the creation of other distributorships, but direct sales to BWAC." *Id.* It also chided JVC for its "strained reading" of *Homedical Inc. v. Sarns/3M Health Care, Inc.,* 875 F.Supp. 947, 951 (D.P.R.1995), observing that *Homedical* "hardly compels a ruling that direct sales cannot be an impairment of a non-exclusive dealership." *Caribbean,* 963 F.Supp. at 1352 n. 25.

Notwithstanding this Court's prior analysis, the Puerto Rico district court's decision in *Caribe* and the First Circuit's recent affirmance both strongly support JVC's prior argument and compel reconsideration of the Court's May 12, 1997 decision. *Caribe* involved facts remarkably similar to the case at hand. There, the plaintiff, Caribe Industrial Systems, Inc. ("Caribe"), was a non-exclusive local distributor for defendant National Starch and Chemical Company ("National"), a manufacturer of "hot melt" adhesive products, whose customer, Checkpoint Systems, Inc. ("Checkpoint"), had ceased purchasing adhesives from Caribe because it was prepared to manufacture the product itself. *See Caribe,* 212 F.3d 26, 28. However, after informing Caribe that it would no longer be a customer, instead of making the adhesives locally, Checkpoint contracted to "buy them directly from National, omitting Caribe from the distribution chain." *Id.* Caribe sued for damages and provisional relief under Law 75. *See id.* Facing a motion to dismiss for failure to state a claim, Caribe argued that even if the Court deemed its distributorship non-exclusive, Law 75 prohibited National from selling directly to Checkpoint because such sales constituted "an unjustified act detrimental to the established relationship between both entities." *Caribe,* 36 F.Supp.2d at 450.

The district court disagreed. Characterizing the issue as "whether a non-exclusive distribution agreement under Law 75, although flexible to allow multiple distributors, nevertheless forbids the principal from supplying its products directly to the customers of its own distributors," *id.,* the court extended the logic of *Innovation,* 31 F.Supp.2d at 221, reasoning that

> [i]f a supplier is free to create a wholly-owned subsidiary to distribute products where a non-exclusive distributor already exists, it would be absurd to conclude that the same supplier cannot sell its products directly under similar circumstances. *It does not make any practical difference* whether the proceeds of the sales go directly to the supplier, or if they first go to a wholly-owned subsidiary of the supplier that

eventually transfers the profits to the supplier itself.

*Caribe*, 36 F.Supp.2d at 451 (emphasis added). The court then reiterated that Law 75 "does not pamper distributors into acquiring rights that they have never possessed to begin with," and dismissed Caribe's claims in their entirety. *Id.* at 452.

On May 8, 2000, the First Circuit affirmed the dismissal, albeit on different grounds. This time, the panel focused on the fact that by the time Checkpoint entered into its agreement with National to buy the adhesives directly, it had already terminated its customer relationship with Caribe. *See Caribe*, 212 F.3d 26, 30. Although Caribe had argued on appeal that "Checkpoint remained its customer even after Checkpoint announced *its* intention to discontinue purchasing product from Caribe." *id.* at 28, the Court of Appeals found that "Checkpoint had made it clear that it would no longer purchase adhesives from Caribe—*i.e.*, that Checkpoint effectively announced its plans to end its existing customer relationship with Caribe—before it entered a new arrangement to purchase products directly from National," *id.* at 29. It therefore held that when Checkpoint "communicated that it would no longer proceed with its relationship with Caribe," *id.* at 30, "Caribe's status as a dealer supplying Checkpoint with National's product was at an end," *id.* at 29. Thus, once Checkpoint terminated its relationship with Caribe, there was nothing to prevent National from dealing with Checkpoint directly. *See id.* at 30.[6]

Both *Caribe* decisions are obviously applicable to the facts at hand. As the Court has previously discussed, *see supra* at 241–42, the relationship between CWS and JVC was non-exclusive;[7] hence, JVC was free to appoint as many distributors in Puerto Rico as it wished. *See Borschow*, 96 F.3d at 16; *Vulcan*, 23 F.3d at 569. Under *Innovation*, 31 F.Supp.2d at 223, JVC could have created a wholly-owned subsidiary for the purpose of distributing its products in Puerto Rico, even if that subsidiary competed with CWS.[8] And, according to the district court in *Caribe*, the fact that JVC sold its products directly to

---

**6.** Upon the issuance of the First Circuit's opinion, this Court, on its own initiative, invited the parties to submit letter briefs addressing the implications of the decision. *See* Letter from Richard S. Taffet, Esq. to the Court, dated May 25, 2000, at 1–4 ("Taffet Letter"); Letter from Norman L. Faber, Esq. to the Court, dated May 24, 2000, at 1–4 ("Faber Letter").

**7.** Although CWS ostensibly does not dispute this finding, *see* Pl. Opp. Mem. at 8 n. 4, it notes that JVC never appointed any other distributors in Florida, *see id.* (citing *Caribbean*, 963 F.Supp. at 1345 n. 1). While CWS may be implying that CWS's distributorship was thereby *de facto* exclusive, a supplier's failure to appoint additional distributors does not convert a non-exclusive arrangement into an exclusive contract. *See Harley–Davidson*, 6 F.Supp.2d at 1001.

**8.** CWS endeavors to distinguish *Innovation* on numerous grounds. For example, it notes that the plaintiff in that case was a sales representative seeking relief under Puerto Rico's Law 21, P.R. Laws. Ann. tit. 10, § 279 *et seq.*—not Law 75—and the court's ruling involved the propriety of a preliminary in-

junction in favor of the plaintiff—not summary judgment. *See* Pl. Opp. Mem. at 8. In addition, the outcome in *Innovation* turned on the existence of an "exclusive sales representation contract," absent which a Law 21 claim is not cognizable. *Innovation*, 31 F.Supp.2d at 220; *see also id.* at 222–23. By contrast, CWS posits that because Law 75 does not require contractual exclusivity, *see Borschow*, 96 F.3d at 14; *Vulcan*, 23 F.3d at 569, the instant action is distinguishable.

Yet, the Puerto Rico district court has not adopted CWS's interpretation of *Innovation*, *see Caribe*, 36 F.Supp.2d at 451, nor does this Court read its holding to be so narrow in scope. Moreover, *Innovation*'s reliance on Law 21 is irrelevant, since "Law 21 is modeled after ... Law 75, and it is well settled that applicable jurisprudence to Law 75 is also of application in controversies as per Law 21." *Innovation*, 31 F.Supp.2d at 220; *see also id.* at 223; *Orba*, 49 F.Supp.2d at 71. Likewise, the fact that *Innovation* merely denied a preliminary injunction is inapposite, for the court also expressed "serious doubts" about the plaintiff's likelihood of success on the merits. *See Innovation*, 31 F.Supp.2d at 224.

BWAC rather than forming a Puerto Rican subsidiary is a distinction without a difference. *See Caribe*, 36 F.Supp.2d at 451.[9]

CWS endeavors to distinguish *Caribe*, emphasizing that Caribe's distributorship agreement expressly reserved National's right to sell its products directly to Puerto Rican customers, in contrast to the Agreement between JVC and CWS, which did not contain analogous provision. *Compare Caribe*, 212 F.3d 26, 27; and *Caribe*, 36 F.Supp.2d at 451, *with* Taffet Aff., Exh. B. JVC correctly points out, however, that "[t]he issue ... is not whether JVC expressly reserved such a right to itself, but rather whether a right contractually granted to [CWS] was impaired by JVC's direct sales." Def. Mem. at 9. The fact that JVC's Agreement did not explicitly reserve its right to sell its products directly to customers does not, by itself, suggest that it had covenanted not to do so.[10] Rather, the Agreement unambiguously stated that CWS had no "exclusive right" to sell JVC products. Taffet Aff., Exh. B, ¶ 1. It also guaranteed JVC's right "to effect changes in ... or reallocate the distribution of" any of its products in Puerto Rico. *Id.* ¶ 5(c)(v). Were subparagraph 5(c)(v) to be construed as limited only to the appointment of additional distributors, it would render superfluous paragraph 5(f), which guaranteed

JVC "the absolute right to increase or decrease the number of DISTRIBUTORS in [Puerto Rico] or elsewhere, at any time without notice to [CWS]." *Id.* ¶ 5(f). Clearly, then, JVC never granted CWS the right to be free from direct competition from JVC.

Like Caribe, CWS is essentially arguing that even after losing BWAC as a customer, it should have had the exclusive right to recapture BWAC's business on JVC's behalf. In its memorandum of law, CWS cited this Court's earlier statement that a jury could find that "[BWAC] would have decided to resume buying such merchandise from CWS, had not JVC offered advantageous terms." Pl. Opp. Mem. at 5 (citing *Caribbean*, 963 F.Supp. at 1353); *see also* Faber Letter at 2. Indeed, "before commencing direct purchases of audio products from JVC, BWAC had to negotiate with JVC the prices and other terms it would receive." *Caribbean*, 963 F.Supp. at 1352. According to CWS, it was this solicitation that violated Law 75.

Yet, while CWS characterizes Caribe's case as lacking evidence that National engaged in similar negotiations with Checkpoint, *see* Pl. Opp. Mem. at 9, in fact, quite the opposite is true. In early June 1997, National met privately with Checkpoint, after which the two "agreed that instead of manufacturing the adhesives itself, Check-

---

9. In affirming the district court's decision, the First Circuit elected not to reach "the broader question [of] whether National could have sold goods directly to Checkpoint at a time when Checkpoint was Caribe's ongoing customer." *Caribe*, 212 F.3d 26, 30. Likewise, this Court need not decide that thorny issue, since BWAC had effectively terminated its relationship with CWS in early 1990. *See supra* at 237–38.

10. *Cf. Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 63 F.3d 262, 279–80 (3d Cir.1995) (holding that because the agreement between a manufacturer and its wholesale distributor unambiguously provided for a non-exclusive relationship, the manufacturer did not breach the agreement by selling products directly to dealers in the distributor's sales area); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 484 (5th Cir.1984) (finding that

defendant did not breach its non-exclusive franchise agreement by acquiring a nearby competing hotel); *Jones Distrib. Co. v. White Consolid. Indus., Inc.*, 943 F.Supp. 1445, 1465 (N.D.Iowa 1996) (granting dismissal where the distribution agreement specifically stated that plaintiff's distributorship was "non-exclusive," and the record demonstrated that defendant had sold products directly to dealers within plaintiff's territory throughout their entire relationship); *Integrated Micro Sys., Inc. v. NEC Home Elecs. (USA), Inc.*, 174 Ga.App. 197, 329 S.E.2d 554, 557 (1985) (affirming that defendant distributor did not breach its contract with plaintiff dealer by contracting directly with plaintiff's prospective customer, where the parties' agreement provided that plaintiff's appointment as an authorized dealer was "on [a] non-exclusive basis").

point would by them directly from National." *Caribe*, 212 F.3d 26, 27. Furthermore, Caribe specifically alleged that Checkpoint " 'would have never ceased purchasing adhesives from [it] had National never offered them directly to Checkpoint.' " *Id.* at 29 (quoting *Caribe*, 36 F.Supp.2d at 450). Finally, National waited until many months—almost exactly as long as JVC waited—after Checkpoint had terminated its relationship with Caribe before approaching Checkpoint with its offer. *Compare Caribe*, 212 F.3d 26, 29–30 (finding that Checkpoint terminated its relationship with Caribe on March 26, 1997, and National entered into its own agreement with Checkpoint in May or June of 1997), *with supra* at 237–38 & n. 3 (noting that while BWAC's purchases from CWS had declined dramatically by March 1990, BWAC did not begin negotiating with JVC until that summer). Therefore, though JVC may have persuaded BWAC to buy merchandise from it directly rather than resume purchasing from CWS, *see Caribbean*, 963 F.Supp. at 1353, there is no material difference between such conduct and the negotiations alleged and assumed in *Caribe*.

Given the similarities between National's solicitation of Checkpoint and JVC's courtship of BWAC, this effort to distinguish *Caribe* must also fail. The First Circuit has recognized that under CWS's approach, "if [CWS] were not able to persuade [BWAC] to purchase [JVC's] product through it, then [JVC] would have no recourse but to accept the loss of [BWAC's] business." *Caribe*, 212 F.3d 26, 30 n. 5. Despite their past dealings, once BWAC ended their relationship, CWS had no exclusive right to seek BWAC's business. Absent any evidence that JVC in-duced BWAC's original decision to stop buying from CWS, *see Caribbean*, 963 F.Supp. at 1351–53, the Court "see[s] nothing in the terms of the Agreement that imposes such an extreme restriction on [JVC's] right to sell directly," *Caribe*, 212 F.3d 26, 30 n. 5. Thus, JVC did not violate CWS's contractual rights and cannot be held liable under Law 75.[11]

Having construed all of the evidence in the light most favorable to CWS and having drawn all reasonable inferences in its favor, the Court finds no material distinction between the facts of this case and those in *Caribe*. As a result, the First Circuit's decision in *Caribe* is controlling authority for the proposition that, in the absence of an exclusive distributorship agreement or some express contractual prohibition, a manufacturer does not violate Law 75 by selling its product directly to a former customer of its distributor. *See Caribe*, 212 F.3d 26, 30. "The fact of the matter is that [JVC] has decided to exercise one of its rights under the contract that it previously—for whatever reason—had chosen not to exercise, and said right implicates direct selling, not termination nor harm to the supplier-distributor, non-exclusive relationship." *Caribe*, 36 F.Supp.2d at 451; *see also Jones Distrib. Co.*, 943 F.Supp. at 1481 ("[T]he alleged violations of good faith were actually exercises of rights specifically reserved under the [distributorship] Agreement and therefore cannot form the basis of a claim of breach of duty of good faith."). To the extent that this Court, in its previous decision, held otherwise, that portion of the Opinion and Order must be vacated. CWS's remaining claim against JVC shall be dismissed with prejudice.

---

11. The remaining dissimilarities between this case and *Caribe* are also immaterial. For example, CWS complains that JVC surreptitiously withheld notice of its intention to sell products directly to BWAC. Yet, nothing in Law 75 or the Agreement required such notice. In fact, JVC expressly retained its right to appoint additional distributors in Puerto Rico "at any time *without notice* to [CWS]." Taffet Aff., Exh. B, ¶ 5(f) (emphasis added). Finally, unlike Checkpoint, BWAC never had the capacity itself to manufacture the products it had been buying from CWS. *See* Pl. Opp. Mem. at 9. Regardless, the Court fails to see how BWAC's ability to manufacture audio equipment is in any way relevant to the issue of CWS's contractual rights.

**246**

### III. CWS's Motion for Sanctions

■ On May 21, 1999, CWS filed a cross-motion seeking sanctions against JVC, pursuant to Fed.R.Civ.P. 11(c), on the grounds that JVC's renewed motion for summary judgment was frivolous and intended to delay trial and increase CWS's litigation costs. Now that the Court has granted JVC's motion, it is obvious that it was CWS's cross-motion for sanctions—not JVC's motion—that was unwarranted. *See General Elec. Co. v. Speicher*, 877 F.2d 531, 538 (7th Cir.1989) (characterizing motion for sanctions for filing a frivolous appeal as "itself frivolous and sanctionable," because "[f]ar from appealing frivolously, [the] appeal has overwhelming merit"). Moreover, it should be noted that CWS provided only seven days' notice of its motion, *see* Pl. Notice of Cross–Motion at 2, and thus failed to comply with the 21–day "safe harbor" requirement of Fed. R.Civ.P. 11(c)(1)(A). This, in and of itself, is sufficient grounds for denial of CWS's motion. *See Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1328–29 (2d Cir.1995).

In response to CWS's request for sanctions, JVC asks the Court to award it the reasonable expenses and attorneys' fees it incurred in opposing the cross-motion. *See* Fed.R.Civ.P. 11(c)(1)(A) ("If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion."); *Koar v. United States*, No. 96 Civ. 5166, 1997 WL 1038181, at *2 n. 2 (S.D.N.Y. Sept.2, 1997) ("[T]he making of a frivolous Rule 11 motion can itself result in sanctions against the movant."). This request is entirely reasonable, for a Rule 11 motion must never be used as a mere tactic to bolster a response—whether meritorious or not—to a motion or pleading. *See Nakash v. United States Dep't of Justice*, 708 F.Supp. 1354, 1366–67 (S.D.N.Y.1988). For these reasons, Norman L. Faber, Esq., counsel to CWS, shall remit to JVC its reasonable expenses and attorneys' fees incurred in opposing the cross-motion, not to exceed five hundred dollars.

### CONCLUSION

For the foregoing reasons, JVC's renewed motion for summary judgment is HEREBY GRANTED. The Clerk of the Court is directed to dismiss CWS's Complaint in its entirety. Furthermore, CWS's cross-motion for sanctions is HEREBY DENIED. Norman L. Faber, Esq., counsel to CWS, is HEREBY ORDERED to remit to JVC its reasonable expenses and attorneys' fees incurred in opposing CWS's cross-motion, not to exceed five hundred dollars. Within ten days of the date of this Opinion and Order, counsel to JVC shall submit an application and affidavit detailing such expenses and fees. Finally, the parties are ordered to appear before this Court at the United States Courthouse, 500 Pearl Street, Courtroom 18B, New York, New York, on Thursday, July 6, 2000, at 10:00 a.m. for a pre-trial conference.

**SO ORDERED.**