**RE–ACE, INC., Plaintiff,**

v.

**WHEELED COACH INDUSTRIES, INC., Defendant.**

**Civil No. 03–1285 (CCC/GAG).**

United States District Court, D. Puerto Rico.

Nov. 4, 2004.

---

Alfredo Fernandez–Martinez, Jose A. Fernandez–Paoli, Delgado & Fernandez Union Plaza, Patricia Lorenzi, Delgado & Fernandez, San Juan, PR, for Plaintiff.

Graciela J. Belaval–Bruno, Martinez, Odell & Calabria, San Juan, PR, Jorge Bermudez–Torregrosa, Cuevas, Kuinlam & Bermudez, Hato Rey, PR, Mirta E. Rodriguez–Mora, Latimer, Biaggi, Rachid & Godreau, Carmen P. Figueroa, San Juan, PR, Antonio Vergne–Mirabal, Guaynabo, PR, for Defendant.

Eyck O. Lugo–Rivera, Martinez Odell & Calabria, San Juan, PR, for Plaintiff/Defendant.

### OPINION AND ORDER

GELPÍ, United States Magistrate Judge.

Before the Court is defendant Wheeled Coach Industries, Inc.'s ("Wheeled Coach") *Motion for Summary Judgment* (Docket No. 187), in which it requests dismissal of the claims brought forth against it by Re–Ace, Inc. ("Re–Ace"), alleging Re–Ace is not a protected dealer under Puerto Rico's Dealer's Act ("Dealer's Act", "Law 75"). P.R. Laws Ann. Tit. 10 § 278 *ss.*

After careful review of all the evidence and material facts, the Court finds that sufficient issues of material fact exist to warrant the **DENIAL** of Wheeled Coach's *Motion for Summary Judgment.*

### I. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides for the entry of summary judgment in a case where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 894 (1st Cir. 1988). *See also* Velázquez Hernández, Jorge, *The Federal Rules of Evidence, Civil and Criminal Procedure, As Interpreted by the First Circuit Court of Appeals and the U.S. District Court of Puerto Rico,* p. 202–212 (2000).

Summary judgment is appropriate where, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, there is not the slightest doubt as to whether a genuine issue of material fact exists. *Kennedy v. Josephthal & Co., Inc.,* 814 F.2d 798, 804 (1st Cir.1987). A "genuine" issue is one that is dispositive, and which consequently must be decided at trial. *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact, which is defined by the substantive law, is one which affects the outcome of the suit and which must be resolved

before attending to related legal issues. *Mack,* 871 F.2d at 181.

The party filing a motion for summary judgment bears the initial burden of proof to show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thereafter, the burden shifts to the non-movant to provide the Court, through the filing of supporting affidavits or otherwise, with "some indication that he can produce the quantum of evidence [necessary] to enable him to reach the jury with his claim." *Hahn v. Sargent,* 523 F.2d 461, 468 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). The non-movant cannot rest upon mere allegations or denial of the pleadings. Fed.R.Civ.P. 56(e). Indeed, the non-movant must affirmatively show that "sufficient evidence supporting the claimed factual dispute [exists] to require a jury or judge to resolve the parties' differing versions of truth at trial." *First Nat. Bank of Ariz. v. Cities Service Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), *reh'g denied,* 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968).

## II.  *LEGAL ANALYSIS*

Puerto Rico's Law 75[1] governs the business relationship between "principals" and the locally appointed "distributors" who market their product. *See Caribe Industrial Systems, Inc. v. National Starch and Chemical Co.,* 212 F.3d 26, 29 (1st Cir. 2000). The Dealer's Act, as Law 75 is commonly referred to, was enacted to avoid the arbitrary termination of distribution relationships once the designated dealer had successfully developed a local market for the principal's product or services. *Re–Ace, Inc. v. Wheeled Coach In-*

dustries, Inc., 363 F.3d 51, 54 (1ST Cir. 2004).

In the case at bar, the Court must determine whether the relationship between Re–Ace and Wheeled Coach constitutes a dealer contract, therefore entitling Re–Ace to the benefits of Law 75. Specifically, Wheeled Coach claims that Carlos Leal ("Leal"), Re–Ace's chief executive officer, was merely a broker who acted as a middleman between Wheeled Coach and Ford motor vehicle distributors in Puerto Rico, and whose lone role was to quote prices for said distributors. *Memorandum of Law in Support of Summary Judgment,* p. 2, 19 (Docket No. 192).

Among the duties Wheeled Coach alleges Re–Ace failed to perform are the purchase of ambulances and parts for re-sale, the purchase and maintenance of demonstrator vehicles, advertising and marketing the ambulances and products, and the maintenance of a sales and service organization. In addition, Wheeled Coach claims that Re–Ace made no investment in advertising and/or marketing, that it failed to successfully bid for General Service Administration contracts, and that it lacked any administrative structure. The preceding factors, Wheeled Coach alleges, evidences the fact that Re–Ace was not a distributor protected under the Dealer's Act. *Memorandum of Law in Support of Summary Judgment,* p. 6, 10, 13 (Docket No. 192).

I.

At the outset the Court notes that the parties place extreme emphasis on the labels used to identify Re–Ace in its relationship with Wheeled Coach. Law 75 defines a dealer's contract as the "relationship established between a dealer and a principal or grantor whereby and **irrespec-**

---

1.  P.R. Laws Ann. Tit. 10 § 278 *ss.*

tively of the manner in which the parties may call, characterize or execute such relationship, the former actually and effectively takes charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico." P.R. Laws Ann. Tit. 10 § 278(b) (emphasis added). Consequently, whether or not Re–Ace was ever referred to as a dealer or distributor is inconsequential. What matters is the actual functions performed by Re–Ace during its relationship with Wheeled Coach, and whether those actions warrant Law 75 protection. *Re–Ace*, 363 F.3d at 54.

Under Law 75, a dealer is defined as a "person actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service." P.R. Laws Ann. Tit. 10 § 278(a). Pursuant to the Puerto Rico Supreme Court's ruling in *Roberco, Inc. & Roberto Colón v. Oxford Industries, Inc.*, 122 D.P.R. 115, 131–32 (1988), the Court must determine if Re–Ace has the requisite autonomy to be a dealer under the Dealer's Act. In doing so, the Court must view Re–Ace's claim in light of the factors set forth in *Roberco*: promotion of the product, keeping an inventory, fixing prices, delivery and billing responsibilities, authority to extend credit, advertising campaigns, assumption of risk, purchasing the product, maintaining facilities, and offering product-related services

to clients. *See Triangle Trading Co., Inc. v. Robroy Industries, Inc.*, 200 F.3d 1, 4–5 (1ST Cir.1999); *Oliveras v. Universal*, 141 D.P.R. 900, 915 (1996).

## II.

■ It is undisputed that Re–Ace has not invested any money in advertising campaigns aimed at promoting Wheeled Coach products. *Wheeled Coach's Uncontested Material Fact* No. 28 (Docket No. 188). While Leal alleges he personally marketed Wheeled Coach products to buyers and clients,[2] he admits to failing to submit a marketing plan requested by Wheeled Coach. Re–Ace **Exhibit C,** *Deposition of Carlos Leal*, p. 138. Re–Ace's marketing efforts are, thus, limited to handing out literature on the product. Re–Ace **Exhibit B,** *Carlos Leal's Preliminary Injunction Hearing Testimony*, p. 34.

Leal also testified to the effect that Re–Ace was not responsible for receiving and transporting the vehicles once they arrived at the local port. According to Leal's testimony, the Ford dealers who purchased the ambulances were the ones responsible for that. *Id.*, 101.

In addition, Re–Ace does not keep an inventory, acquire title to the vehicles, nor pay excise tax. *Id.*, 25, 101.

Some of the above facts, are certainly probative of a "just cause"[3] defense.[4]

---

2. Re–Ace's Contested Fact No. 28 (Docket No. 215).

3. Under Law 75, just cause is the "nonperformance of any of the essential obligations of the dealer's contract, on the part of the dealer, or any action or omission on his part that adversely and substantially affects the interests of the principal or grantor in promoting the marketing or distribution of the merchandise or service." P.R. Laws Ann. Tit. 10 § 278(d).

4. The Court notes that Wheeled Coach's only argument in support of summary judgment is that Re–Ace is not a Law 75 dealer. It has not squarely presented to the Court the argument that summary judgment is warranted on the alternate ground of just cause to terminate the contract. Thus, the Court will not consider this defense for purposes of ruling on Wheeled Coach's summary judgment motion. *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1ST Cir.1999) ("The district court is free to disregard argu-

While the performance of Re–Ace as a dealer is surely in doubt, the structure under which both parties did business during their relationship sets forth sufficient facts at this, the summary judgment cross-road, for the Court to conclude that Re–Ace is protected under Law 75. *Re–Ace*, 363 F.3d at 53–55.

## III.

In the case at bar, there exists a "distributor's contract" between Wheeled Coach and Re–Ace, dated January 1, 1989, which is signed by then Wheeled Coach president Ronald Cartwright. Re–Ace **Exhibit 1.** While the copy submitted to the Court lacks any Re–Ace representative's signature, Leal testified that the contract was executed by Re–Ace and returned to Wheeled Coach, and that it governed the parties relationship from that date on. Re–Ace **Exhibit B,** *Carlos Leal's Preliminary Injunction Hearing Testimony,* p. 20–22. Said agreement set forth a series of continuing obligations on the part of Re–Ace, including maintaining sales and service facilities and personnel, investing in working capital, maintaining lines of credit, and the delivery of numerous accounting and administrative information. Re–Ace **Exhibit 1.** Such a relationship varies from the agreements Wheeled Coach adopts with its brokers and agents, which do not create ongoing requirements or obligations for either party. Re–Ace **Exhibit A,** *Deposition of James Phillips on behalf of Wheeled Coach, Inc.,* p. 24. The Court also notes that while the agreement has a one year period, Wheeled Coach has acknowledged that the way both parties did business did not change upon said expiration date. Re–Ace **Exhibit D,** *Deposition of Paul Holzapfel,* p. 88.

Furthermore, it is clear that Wheeled Coach has established a market for its ambulances within Puerto Rico, even though it has never sold its ambulances directly in Puerto Rico, performed any marketing efforts on the island, participated directly in any bid for the sale of ambulances, or in any manner communicated with its local customers. Re–Ace **Exhibit A,** *Deposition of James Phillips on behalf of Wheeled Coach, Inc.,* p. 107–08; Re–Ace **Exhibit D,** *Deposition of Paul Holzapfel,* p. 45, 70. Moreover, Wheeled Coach concedes that it sold ambulances in Puerto Rico exclusively through Re–Ace during the period between 1979 and 2003. *Wheeled Coach's Memorandum of Law in Support of Summary Judgment,* p. 26 (Docket No. 192). In fact, a senior member of the Wheeled Coach brass specifically testified that he had no knowledge of *any* effort on the part of Wheeled Coach to develop the market for the sale of ambulances in Puerto Rico. Re–Ace **Exhibit D,** *Deposition of Paul Holzapfel,* p. 54. In light of this, the Court can reasonably infer that Re–Ace directly contributed to the establishment of said market.

■ With the preceding in mind, the Court notes that Wheeled Coach's failure to develop the market itself does not necessarily garner Re–Ace protected status. The Court must find that Re–Ace's functions as Wheeled Coach's local representative were sufficient to consider it "actually

ments that are not adequately developed"); *Mandavilli v. Maldonado,* 38 F.Supp.2d. 180, 199 n. 4 (D.Puerto Rico 1999) ("This fact, however, was not developed as part of [defendant's] argument, and therefore, the Court will not address the implications of this fact in its analysis of defendant's basis for summary judgment"); *see also United States v. Marks,* 365 F.3d 101, 107 (1st Cir.2004) (*citing United States v. Zannino,* 895 F.2d 1, 7 (1st Cir.1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work.")).

and effectively" took charge of Wheeled Coach's local business.

In the relationship between Wheeled Coach and Re–Ace, the initial contact for the production of an ambulance would be made by Re–Ace through a purchase order which included a detailed description of the vehicle's specific configuration. Re–Ace Exhibit A, *Deposition of James Phillips on behalf of Wheeled Coach, Inc.*, p. 58. Once received, Wheeled Coach would later send a "build order" to Re–Ace for confirmation of the vehicle details, "to make sure that what [Wheeled Coach is] building is what [Re–Ace] wants." Re–Ace Exhibit D, *Deposition of Paul Holzapfel*, p. 63.

Moreover, Leal testified that Re–Ace provided warranty service to Wheeled Coach customers through third parties, who were paid by Re–Ace. Re–Ace Exhibit B, *Carlos Leal's Preliminary Injunction Hearing Testimony*, p. 20–22. This appears to be a relatively common practice in the industry. Re–Ace Exhibit D, *Deposition of Paul Holzapfel*, p. 21–23. Likewise, Re–Ace was responsible for informing Wheeled Coach of where the ambulances were to be delivered. *Id.*, 83.

In addition, contact with the Ford dealers who ultimately sold the vehicles to the end users was made by Re–Ace. Wheeled Coach did not participate in any way in the negotiations and contracts between Re–Ace and said dealers, nor did it know of the specific terms and/or conditions of said agreements. Re–Ace Exhibit A, *Deposition of James Phillips on behalf of Wheeled Coach, Inc.*, p. 89. In fact, one Wheeled Coach executive admitted to never meeting a Wheeled Coach end user in Puerto Rico if not through Re–Ace. Re–Ace Exhibit D, *Deposition of Paul Holzapfel*, p. 52.

Additionally, Re–Ace's operation is not risk free, as alleged by Wheeled Coach, as evidenced by the fact that if a vehicle were ordered by a customer through Re–Ace and that order were subsequently cancelled, Re–Ace would be responsible for payment of the vehicle. Re–Ace Exhibit A, *Deposition of James Phillips on behalf of Wheeled Coach, Inc.*, p. 109–10.

Other facts, while in no way conclusive, also imply dealership status. For example, a Wheeled Coach executive testified to the effect that if a user were to arrive "check in hand" at the Wheeled Coach headquarters looking to purchase a vehicle, Wheeled Coach would not go through with the sale if said individual was from an area where the company already had representation in place. On the occasions in which such visits occurred in regards to ambulances to be shipped to Puerto Rico, Wheeled Coach would refer the customer to Re–Ace, evidencing a certain degree of deferral consistent with dealer standing. *Id.*, 158–59. In fact, such deference is even more indicative of dealer standing when considering that such a practice is not adopted by Wheeled Coach when the area representative is not a dealer or district sales manager. In that event, Wheeled Coach would go ahead with the direct price quote and not refer the potential customer to the area sales agent. Re–Ace Exhibit D, *Deposition of Paul Holzapfel*, p. 35–36.

Re–Ace also twice attended Wheeled Coach's annual dealer's meeting, to which only company dealers are invited. *Id.*, 56–57.

Last and most importantly, Re–Ace was the party responsible for establishing the vehicles' price to the Ford dealer. While it would be given a base unit price from Wheeled Coach, it would add on the margin of profit it deemed adequate, and sold the units at the resulting price. Re–Ace

Exhibit A, *Deposition of James Phillips on behalf of Wheeled Coach, Inc.*, p. 89.

In conclusion, the Court finds that the functions performed by Re–Ace during its relationship with Wheeled Coach, in conjunction with the dealership agreement between the parties and Wheeled Coach's conduct, all provide sufficient issues of material fact to warrant **DENIAL** of Wheeled Coach's *Motion for Summary Judgment* (Docket No. 187). As it stands, the record is ripe with issues of credibility and evidence that preclude summary judgment.

### CONCLUSION

In light of the preceding, the Court hereby **DENIES** Wheeled Coach's *Motion for Summary Judgment.* (Docket No. 187).[5]

**IT IS SO ORDERED.**

**5.** The fact that Re–Ace has prevailed both at the injunction and summary judgment stages of this case in no way precludes Wheeled Coach from ultimately prevailing at trial, particularly on the basis of its "just cause" defense, given the facts now before the Court. Consequently, the parties and counsel are highly encouraged to put their best effort to end this litigation via a settlement. If the parties are unable to do so after mediation before Magistrate Judge Marianne B. Bowler of the District of Massachusetts, as scheduled in the month of December, the Court shall set a trial date for early 2005.